772 A.2d 368

EILEEN NOBREGA, FRANK AND ANNA SCALISE, SALVATORE APUZZIO, JR., DORIS AND KWONG AU, SAMUEL BASKING-ER, BONNIE BERTUCCI, BRUCE AND RACHEL BINKOWITZ, WILLIAM BLUESTONE, YVONNE BRIX, PATRICIA BUSH, RO-LAND AND BETTY CHANG, JIM AND CHUEN CHU, ALICJA CIOBANU AND PAUL SZOTT, CORNELL AND FRAN COCO, DAN AND CONNIE COLON, ROSE MARY CORRALES, ALAN AND BARBARA COSCARELLI, SCOTT AND CHRISTY DAVIS, ELAINE DELORENZO, DIANE DIGIULIO, ARLENE AND BARRY FINK, STEVEN AND KATHLEEN FUSCHETTI, ELIZ-ABETH GOMEZ, WORSELEY AND ULA GREENIDGE, HARRY GRIEFER, MICHAEL AND TERESA HAMMALAK, ANDRE

AND MERITTA HERSCOVICI, MARILYN AND GEORGE HIGGINS, LINDA IONTA, STEPHEN E. AND AMY S. KANE, ARLENE KAPLAN, IRWIN, BARRY AND MURIEL KESHNER, CAROLYN B. KILPONEN, BILL AND TERRY KONCAR, FRANK KOWALEWSKI, ALBERT AND JEAN KUCHINSKAS, THERESA LEONARDIS, JOHN AND PHYLLIS MAFFUCCI, JOSEPH AND CELIA MANDEL, NATHAN AND MOLLY MARKO, ESTHER MULLALY, TERESA O'HARA, LEONARD OLEN, VICTORIA MONTANINO ORTIZ, OSCAR AND LOIS PANNELLA, AUDREY PRESS, SUSAN PUHAN, DONNA RANDO, YVES ROC, SCOTT ROSMARIN, KENNETH G. SABLE, MARK AND MIRTA SMOLAR, ZAIDA AND ANGEL SOTOLONGO, KATHRYN STANCO, STEWART THOMPSON, VINCENT AND CAROLYN VARCA, ANDREW AND CAROLYN VITTORIA, LARRY AND ARLEEN WEISENSTEIN, DANA ZAIFERT AND EDWARD ZIMMERMAN, PLAINTIFFS–RESPONDENTS, v. EDISON GLEN ASSOCIATES, A NEW JERSEY PARTNERSHIP, ARIE HALPERN, DAVID HALPERN, FRED HALPERN, JACK HALPERN, MURRAY HALPERN, SAM HALPERN, JOSEF PARADIS, HENRY STEIN, ESTATE OF HARRY WILF, JOSEPH WILF, ERIC ROSENBAUM AND PAUL VISSER, DEFENDANTS–APPELLANTS, AND JOHN DOES A–S, DEFENDANTS.

Argued January 16, 2001—Decided May 22, 2001.

524

*Frederick B. Polak,* argued the cause for appellants (*Post, Polak, Goodsell & MacNeill,* attorneys; *Mr. Polak, Robert A. Goodsell* and *Christopher O. Eriksen,* of counsel and on the briefs).

*Dennis A. Estis,* argued the cause for respondents (*Greenbaum, Rowe, Smith, Ravin, Davis & Himmel,* attorneys; *Mr. Estis* and *Jessica R. Mayer,* on the briefs).

*Paul H. Schneider,* argued the cause for amicus curiae, New Jersey Builders Association (*Giordano, Halleran & Ciesla,* attorneys; *Michael J. Gross,* of counsel).

The opinion of the Court was delivered by

STEIN, J.

Plaintiffs are ninety homeowners who purchased condominium units from Petitioners Edison Glen Associates and its individual partners (Edison Glen), the developers and sellers of those units. We granted certification to decide whether the New Residential Real Estate Off–Site Conditions Disclosure Act ("Disclosure Act" or "Act"), *N.J.S.A.* 46:3C–1 to –12, authorizes lawsuits against Edison Glen under the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –85, for knowingly failing to disclose to plaintiffs the existence of toxic waste sites in close proximity to the condominium development, and whether the provisions of the Act that exonerate sellers from liability for non-disclosure of off-site conditions prior to the Act's effective date may be applied retroactively in this case.

I

This action initially was dismissed in the Law Division on the basis of a *Rule* 4:6–2(e) motion to dismiss that was converted into a motion for summary judgment, *Rule* 4:46–2, by the submission of certifications, with the result that the facts are relatively undeveloped. Viewed in a light most favorable to plaintiffs, the non-moving party, *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), the relevant facts are as follows.

Respondent Eileen Nobrega is president of the Edison Glen Condominium Association and one of the purchasers of sixty residential units in the Edison Glen complex acquired between February 1987 and September 1991. The complex contains 315 units and is located on U.S. Route 1 in Edison Township, Middlesex County. Edison hosts at least three "Superfund" sites included on the U.S. Environmental Protection Agency's (EPA) National Priorities List (NPR) pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 *U.S.C.A.* § 9601 to 9675. Two of those sites are located within two miles of the Edison Glen complex. The first, a site formerly used by Renora, Inc., was placed on the Superfund list in 1982, prior to the construction of the Edison Glen complex, as a result of the EPA's determination that its storage containers for hazardous waste had deteriorated, permitting the discharge of lethal toxins into the soil and groundwater. The second, formerly owned by Chemical Insecticide Corporation, was placed on the Superfund list in 1990 after the EPA determined that arsenic and other hazardous substances had leached into the soil and groundwater after being dumped illegally on the property.

Edison Glen began developing and selling units in the complex in 1987. Plaintiffs allege that Edison Glen knew or should have known about the nearby Superfund sites, and of the hazardous substances that discharged into the surrounding soil and groundwater, but failed to disclose that information to plaintiffs before the condominiums were purchased. Nobrega stated in her certification that she did not become aware of the existence of the Superfund sites until 1992 or 1993. She added that around 1993 or 1994 she discovered that several homeowners in the development were experiencing difficulty selling their units, and that around the same time Edison Glen ceased selling the remaining units, electing instead to reserve them for rental. In November 1996, an appraisal agency hired by plaintiffs issued a report in which it concluded that, based on a preliminary analysis of sales between 1988 and 1995, the market value of the Edison Glen units declined by 40 percent, presumably as a result of the proximity of

the Superfund sites to the units. Plaintiffs contend that the report made them aware for the first time that they suffered actual damages as a result of the Superfund sites.

After negotiations between plaintiffs and Edison Glen proved futile, plaintiffs brought suit in May 1997, alleging common law claims of negligence, fraud and misrepresentation, breach of contract, breach of warranty, and violation of the Consumer Fraud Act. Edison Glen moved to dismiss on the ground that each of the claims were barred by the Disclosure Act. The Law Division granted Edison Glen's motions with respect to the common law claims, but ruled initially that the Consumer Fraud Act claims survived the Disclosure Act. The court reversed itself, however, on Edison Glen's motion for reconsideration, concluding that Section 10 of the Disclosure Act precluded plaintiffs' Consumer Fraud Act claims.

The Appellate Division reversed. *Nobrega v. Edison Glen Associates*, 327 *N.J.Super.* 414, 743 *A.*2d 864 (App.Div.2000). We granted certification, 165 *N.J.* 137, 754 *A.*2d 1213 (2000).

## II

Plaintiffs claim that Edison Glen owed them a duty under the common law and Consumer Fraud Act to disclose the existence of the two nearby Superfund sites, and that Edison Glen's breach of that duty caused them damages. Edison Glen defends by arguing that the Disclosure Act, which was passed after the properties in this case were conveyed, applies retroactively to bar plaintiffs' claims. The Appellate Division did not address the retroactivity issue, holding instead that the Disclosure Act did not bar Consumer Fraud Act claims for intentional failure to disclose off-site conditions affecting the value of properties. 327 *N.J.Super.* at 420–26, 743 *A.*2d 864.

In *Strawn v. Canuso*, 140 *N.J.* 43, 657 *A.*2d 420 (1995), we addressed claims by over 150 families seeking damages because the new homes they purchased were constructed near a hazardous waste dump site, and the defendants—builders and brokers of the

multi-home development—failed to inform the plaintiffs of the existence of the site. *Id.* at 49, 657 *A.*2d 420. The plaintiffs in *Strawn* based their claims on common law principles of fraud and negligent misrepresentation, and the Consumer Fraud Act. *Ibid.*

In relevant part, the Consumer Fraud Act declares as an unlawful practice the knowing "concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any . . . real estate." *N.J.S.A.* 56:8–2.

In *Strawn,* Justice O'Hern, writing for a unanimous Court, held that pursuant to the Consumer Fraud Act and corollary common law principles, the defendants were subject to a duty to disclose off-site conditions affecting the value of the properties:

> [A] builder-developer of residential real estate or a broker representing it is not only liable to a purchaser for affirmative and intentional misrepresentation, but is also liable for nondisclosure of off-site physical conditions known to it and unknown and not readily observable by the buyer if the existence of those conditions is of sufficient materiality to affect the habitability, use, or enjoyment of the property and, therefore, render the property substantially less desirable or valuable to the objectively reasonable buyer.

> [*Id.* at 65, 657 *A.*2d 420.]

Five months after we decided *Strawn,* the Legislature enacted the Disclosure Act. *L.* 1995, *c.* 253 (eff.Sept.12, 1995). Section 2 of the Act, entitled "Legislative findings and declaration," provides:

> The Legislature finds and declares that the purchase of a residence involves a substantial portion of the average household's net worth, and the decision to purchase a particular residence requires consideration of a wide range of factors concerning the area in which the residential real estate is located; that the professionals who engage in the business of selling newly-constructed residential real estate can facilitate prudent decision-making with respect to the purchase of residences by advising purchasers of the availability of information concerning factors which can reasonably be determined to exist and which may affect the value of the residence; that the due diligence responsibilities of purchasers and the disclosure duties of sellers of residential real estate are mutually interdependent and, therefore, ambiguity in the definition and assignment of the sellers' disclosure duties may inadvertently diminish the due diligence efforts of purchasers, or unnecessarily increase the costs of residential real estate transactions; and that there currently exists ambiguity concerning the disclosure duties of the sellers of residential real estate.

> The Legislature therefore determines that *it is in the public interest to define the entirety of the disclosure duties of the sellers of newly-constructed residential real estate* and to create a public repository of relevant off-site conditions which may be accessed by purchasers of such real estate.
>
> [*N.J.S.A.* 46:3C–2 (emphasis added).]

The Act creates a disclosure scheme requiring persons who own, lease or maintain potentially dangerous off-site conditions as enumerated by the Act to provide the municipal clerk of each municipality in which the conditions exist a list of those conditions and their location, and to update the list annually. *N.J.S.A.* 46:3C–5.[1] In addition, the Commissioner of the Department of Environmental Protection is required to provide all municipal clerks with lists of off-site conditions that are located within their respective jurisdictions. *N.J.S.A.* 46:3C–6. The Act requires the seller of new real estate construction to provide the prospective purchaser with a notice, as prescribed by the Act, of the availability of the lists of off-site conditions in the municipal clerk's office and of the buyer's right to cancel the contract within five days after its execution. *N.J.S.A.* 46:3C–8 to –9.

Several portions of the Disclosure Act provide clearly that a seller satisfies its disclosure obligation by furnishing notice of the availability of the lists pursuant to Section 8 of the Act. As noted, the statement of legislative findings indicates that the Legislature intended to "define the entirety of the disclosure duties of the sellers of newly-constructed residential real estate." *N.J.S.A.* 46:3C–2. Section 10(a) of the Act states that "[b]y providing the purchaser with the notice of the availability of the lists, as required by [the Act], the seller ... shall be deemed to have satisfied fully the seller's disclosure duties pursuant to New Jersey law." *N.J.S.A.* 46:3C–10(a). Similarly, Section 10(b) pro-

---

[1] The Act specifies nine off-site conditions to which the Act applies: Superfund sites; hazardous discharge sites listed by the New Jersey Department of Environmental Protection; certain overhead transmission lines; electrical transformer substations; underground gas transmission lines; certain sewer pump stations and sewer trunk lines; sanitary landfills; public wastewater treatment facilities; and airport safety zones. *N.J.S.A.* 46:3C–3.

vides that "[a] seller's responsibility to disclose those conditions that may materially affect the value of the residential real estate, but which are not part of the project, shall be fully met when notice is provided in accordance with the provisions of [the Act]." *N.J.S.A.* 46:3C–10(b). The furnishing of notice "shall be available to the seller as a defense to any claim that the seller failed to disclose any conditions which are not part of the project." *Ibid.*

Notwithstanding those provisions, Section 10(d) provides that the Act

> shall not be interpreted to affect the disclosure requirements for conditions off-site contained in "The Planned Real Estate Development Full Disclosure Act," P.L. 1977, c. 419 (C. 45:22A–21 et seq.), the 'Air Safety and Zoning Act of 1983,' P.L.1983, c. 260 (C. 6:1–80 et seq.) *or in any other statutory provision.*
>
> [*N.J.S.A.* 46:3C–10(d) (emphasis added).]

That the Act was intended to bar non-statutory claims is clear. Plaintiffs contend, however, and the Appellate Division held, that the phrase "any other statutory provision" in Section 10(d) includes the Consumer Fraud Act. In support of its holding, the Appellate Division relied on two statements by then-Governor Christine Todd Whitman respecting the bill that became the Disclosure Act. *Nobrega, supra,* 327 *N.J.Super.* at 422, 743 *A.*2d 864. Prior to the passage of the bill, Governor Whitman issued a statement in which she noted "the need for consumers to know of the existence of off-site conditions and the need for sellers to know the extent of their duty to disclose," and stated that "the bill accomplishes this, I am assured by both sponsors and all interested parties, without interfering with any remedies that may be available in appropriate cases to prospective buyers under the Consumer Fraud Act … or any other relevant statute." *Ibid.* Governor Whitman reiterated that view in a press release issued on the day she signed the bill: "In a statement of intent, Governor Whitman said that the bill does not interfere with any remedies available to prospective buyers under the Consumer Fraud Act." *Ibid.*

Those statements, in addition to "this State's long-standing public policy of affording consumers protection from unconsciona-

ble commercial practices," *id.* at 423, 743 *A.2d* 864, persuaded the Appellate Division to construe the phrase "any other statutory provision" in Section 10(d) to include the Consumer Fraud Act. The court stated:

> [I]t is only the applicability of common-law causes not comprehended by the Consumer Fraud Act that the Legislature intended to abrogate by passing the Disclosure Act. It is well settled that while the Consumer Fraud Act imposes liability both for affirmative misrepresentations and for omissions or failures to disclose, ordinarily only affirmative misrepresentations may be actionable if not made knowingly. Omissions of disclosure, to the contrary, are actionable only if ... the failure to disclose was intentional. We are satisfied that it was preservation of the element of intent, which results in imposition of a more fairly certain and ascertainable obligation of the seller, that was the Legislature's primary concern.
>
> [*Nobrega, supra,* 327 *N.J.Super.* at 425, 743 *A.2d* 864 (citations omitted).]

## III

■ We first consider whether the Disclosure Act precludes claims brought under the Consumer Fraud Act. As noted, Sections 2, 10(a) and 10(b) of the Disclosure Act make clear that satisfaction of the disclosure responsibilities specified by the Act "shall be deemed to have satisfied fully the seller's disclosure duties pursuant to New Jersey law." *N.J.S.A.* 46:3C–10(a). Nevertheless, the Act preserves off-site disclosure responsibilities contained in two specific acts—the Planned Real Estate Development Full Disclosure Act (PREDFDA), *N.J.S.A.* 45:22A–21 to –56, and the Air Safety and Zoning Act of 1983, *N.J.S.A.* 6:1–80 to –88—in addition to "any other statutory provision." *N.J.S.A.* 46:3C–10(d). Clearly, a seller cannot "satisf[y] fully the seller's disclosure duties pursuant to New Jersey law," *N.J.S.A.* 46:3C–10(a), if the seller remains subject to off-site disclosure requirements of "any other statutory provision." *N.J.S.A.* 46:3C–10(d). The provisions contradict, and if we are to provide a workable interpretation of the Act as a whole we will have to move beyond the plain meaning of those sections.

We have long adhered to the well-known canon of statutory construction that the general legislative intent of a statute "will

control the interpretation of its parts." *State v. Bander*, 56 *N.J.* 196, 201, 265 *A.*2d 671 (1970). The legislative history of the Disclosure Act demonstrates that the Act was passed in direct response to our holding in *Strawn, supra*. The Assembly Committee Statement to the Disclosure Act provides in relevant part:

In *Strawn v. Canuso*, decided April 25, 1995, the New Jersey Supreme Court found that sellers of newly constructed residential real estate had certain duties to disclose off-site conditions but offered little guidance as to the extent of the duty or what is required to its satisfaction. This bill defines in its entirety the duty to disclose and those actions necessary to fulfill such duty.

. . .

█ It is also the intent of the bill to reverse the effect of *Strawn v. Canuso* as the case relates to residential real estate contracts for new construction entered into prior to the bill's effective date.

[Assembly Housing Committee, *Statement to Assembly Committee Substitute for Assembly Bill No. 2646* (June 8, 1995).]

We find that statement to be clear and both reflective of the timing of the Act, which was passed only five months after we filed our opinion in *Strawn*, and the intent expressed in the Act itself to "define the entirety of the disclosure duties of the sellers of newly-constructed residential real estate." *N.J.S.A.* 46:3C–2. We are mindful of statements by Governor Whitman, highlighted by the Appellate Division, that may suggest a contrary interpretation of the Act. However, although we may look to statements by the executive branch in determining legislative intent, *see State v. Sutton*, 132 *N.J.* 471, 483, 625 *A.*2d 1132 (1993) (noting that communications from executive branch offer "reliable aid" in determining legislative intent), we afford little weight to such sources where the legislative history itself speaks clearly. *See Cornblatt v. Barow*, 153 *N.J.* 218, 235, 708 *A.*2d 401 (1998) (finding governor's statement "not informative" in view of legislative history).

█ In our view, the evidence of legislative intent surrounding the Disclosure Act undermines the Appellate Division's conclusion. As noted, the Appellate Division construed the phrase "any other statutory provision" to include the Consumer Fraud Act, and construed Sections 10(a) and 10(b) to abrogate only "common-

law causes not comprehended by the Consumer Fraud Act," thereby effecting "preservation of the element of intent" in non-disclosure cases. *Nobrega, supra,* 327 *N.J.Super.* at 424–25, 743 *A.2d* 864. *Strawn* does not address the consequences of unintentional failures to disclose; the standard established by *Strawn* imposes liability for "nondisclosure of off-site physical conditions *known* to [the seller] and unknown and not readily observable by the buyer." *Strawn, supra,* 140 *N.J.* at 65, 657 *A.2d* 420 (emphasis added). The Appellate Division's interpretation of the Disclosure Act thus preserves the basic holding of *Strawn.* "[I]n seeking to discover the legislative intent, the statute must be read in the light of the old law, the mischief sought to be eliminated and the proposed remedy." *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.2d* 388 (1969). The legislative history demonstrates that the Disclosure Act was passed in order to overturn *Strawn,* and we must interpret ambiguities in the Act in a manner that effectuates that purpose. We therefore hold that the Disclosure Act prospectively precludes plaintiffs from suing sellers and developers of real estate under the Consumer Fraud Act for failure to disclose off-site conditions, provided that the sellers and developers satisfy their disclosure obligations under Section 8 and 9 of the Act.

If the phrase "any other statutory provision" in Section 10(d) of the Act does not include the Consumer Fraud Act, it is fair to ask what that language does include. We have noted that "[e]xceptions to a statutory scheme ... should be construed narrowly." *Young v. Schering Corp.,* 141 *N.J.* 16, 25, 660 *A.2d* 1153 (1995); *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 558–59, 362 *A.2d* 13 (1976) ("[W]e are guided by both the legislative intent and the general principle that exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law."). The best way to understand the "any other statutory provision" language is by reference to the two statutes cited specifically in Section 10(d), PREDFDA and the Air Safety and Zoning Act. Each of those statutes imposes specific disclosure obligations with respect to off-site conditions. The Air Safety and Zoning Act requires a seller to notify a prospective

buyer prior to signing a contract for sale that the property is located in an airport safety zone because of the property's proximity to an airport. *N.J.S.A.* 6:1–85.2. PREDFDA requires a seller of real estate to issue a public offering statement that must disclose "all unusual or material circumstances or features affecting the development." *N.J.S.A.* 45:22A–28(a). Administrative regulations specify the circumstances and features contemplated by *N.J.S.A.* 45:22A–28, and require, in part, the disclosure of a property's proximity to "airports or flight paths, railroads, noisy or polluting industrial use or other similar forces." *N.J.A.C.* 5:26–4.2(a)(17).

Interpreted narrowly, and reflective both of the statutes specified in Section 10(d) and the overall purpose of the Disclosure Act, we are persuaded that the "any other statutory provision" exception includes only statutes, like PREDFDA and the Air Safety and Zoning Act, that impose specific off-site disclosure obligations for sellers of real estate, either on the face of the statute or by way of administrative regulation. The Consumer Fraud Act prohibits "knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any ... real estate." *N.J.S.A.* 56:8–2. Prohibitions expressed with the generality of the Consumer Fraud Act do not fall within the "any other statutory provision" exception in Section 10(d).

## IV

The question remains, however, whether the Disclosure Act should apply retroactively. As noted, *supra* at 527, 772 *A.2d* at 371, plaintiffs purchased and acquired title to their properties between 1987 and 1991, and the Disclosure Act was passed in 1995. The Act contains a retroactivity clause, however, which purports to bar most damage claims for non-disclosure of off-site conditions that arose *prior* to the effective date of the Act. The retroactivity section states:

With respect to any residential real estate contracts entered into and fully executed prior to the effective date of this act, no seller shall be deemed to have breached any duty to disclose, nor shall any seller be liable to any person for any loss, damage, or any other injury for failure to have disclosed the existence of any off-site condition or any other condition which is not part of the residential real estate, except in any specific cases in which there has been an action filed in the Superior Court prior to April 25, 1995, or in which the Appellate Division of the Superior Court or the Supreme Court has issued a decision prior to the effective date of this act.

[*N.J.S.A.* 46:3C–10(c).]

Generally, we favor interpretation of statutes that afford prospective application only. *Gibbons v. Gibbons,* 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981). However, where there is an "unequivocal expression of contrary legislative intent," *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 95, 577 *A.*2d 1239 (1990), we will recognize the Legislature's determination. In discerning the legislative intent, we look first to the plain terms of the statute. *Phillips v. Curiale,* 128 *N.J.* 608, 617, 608 *A.*2d 895 (1992); *Morristown v. Woman's Club of Morristown,* 124 *N.J.* 605, 610, 592 *A.*2d 216 (1991); *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." *Butler, supra,* 89 *N.J.* at 226, 445 *A.*2d 399.

Read literally, Section 10(c) would insulate defendants from plaintiffs' common-law fraud and Consumer Fraud Act claims. Plaintiffs, however, interpret the phrase "entered into and fully executed" narrowly to encompass only cases where the real estate transaction has been completed but where the property has not yet been conveyed. We find nothing in the plain meaning of Section 10(c) that affords such a limited reading. *Black's Law Dictionary* defines "execute" as "[t]o fulfill the purpose of; to obey; to perform the commands of." *Black's Law Dictionary* 676 (4th ed.1951). Similarly, *Webster's* defines "execute" as "to put into effect: carry out fully and completely ... perform the acts necessary to the effectiveness of." *Webster's Third New International Dictionary* 794 (unabridged 1993). Those definitions are

reflected in our jurisprudence. See *Wolkoff v. Villane,* 288 *N.J.Super.* 282, 287 n. 1, 672 *A.*2d 242 (App.Div.1996) (citing cases establishing "that 'executed' is used in the sense of 'performed' or 'carried out' "). Obviously a contract for property is not performed completely until the property is actually conveyed. We find the plain language of Section 10(c) to be clear—the Legislature intended that the Disclosure Act apply retroactively to all cases in which the real estate contracts have been entered into prior to the Act's effective date, and that includes those contracts for which the property has been actually conveyed.

Notwithstanding Section 10(c), however, we may pursuant to long-standing precedent decline to apply the Disclosure Act retroactively if one of two conditions is met. First, we would not apply the Disclosure Act retroactively if retroactive application would be unconstitutional. *See State Troopers Fraternal Ass'n of New Jersey v. State,* 149 *N.J.* 38, 54, 692 *A.*2d 519 (1997); *Phillips, supra,* 128 *N.J.* at 617–21, 608 *A.*2d 895; *Twiss v. State,* 124 *N.J.* 461, 469, 591 *A.*2d 913 (1991). In previous cases we have framed that analysis by asking whether retroactive application would constitute "an unconstitutional interference with 'vested rights.' " *Phillips, supra,* 128 *N.J.* at 617, 608 *A.*2d 895. Even in the absence of a constitutional violation, we may nevertheless apply our equitable powers and decline to apply the Act retroactively if retroactive application would constitute "manifest injustice." *State Troopers, supra,* 149 *N.J.* at 55–56, 692 *A.*2d 519; *In re D.C.,* 146 *N.J.* 31, 58, 679 *A.*2d 634 (1996); *Phillips, supra,* 128 *N.J.* at 617, 608 *A.*2d 895.

Our guarded review of retroactive legislation reflects a long-standing belief, as expressed by Joseph Story, that "[r]etrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation, nor with the fundamental principles of the social compact." 2 Joseph Story, *Commentaries on the Constitution of the United States (Abridgment)* § 711 (1838). Retroactive legislation "presents problems of unfairness that are more serious than those posed by prospective

legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein*, 503 *U.S.* 181, 191, 112 *S.Ct.* 1105, 1111, 117 *L.Ed.*2d 328, 340 (1992). Our "vested rights"/"manifest injustice" analysis, to which we have referred consistently in our decisions over the past two decades, *see Edgewater Investment Associates v. Borough of Edgewater*, 103 *N.J* . 227, 238–40, 510 *A.*2d 1178 (1986); *State v. Ventron Corp.*, 94 *N.J.* 473, 498–99, 468 *A.*2d 150 (1983); *Gibbons, supra*, 86 *N.J.* at 521–24, 432 *A.*2d 80, reflects our longstanding recognition of the potential unfairness of retroactive legislation. We reaffirm that recognition today. However, we have discerned in prior cases some doctrinal confusion in the application of the "vested rights" analysis specifically and, more generally, the relationship between the "vested rights" and "manifest injustice" doctrines. We therefore take this opportunity to clarify the two-prong standard and to examine its historical sources.

A

The United States and New Jersey Constitutions contain several explicit and implied limitations on the Legislature's power to impose laws retroactively. Article I, Section 10 of the U.S. Constitution provides that "[n]o State shall ... pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." *U.S. Const.* art. I, § 10, cl. 1. Although "the Latin phrase 'ex post facto' literally encompasses any law passed 'after the fact,'" *Collins v. Youngblood*, 497 *U.S.* 37, 41, 110 *S.Ct.* 2715, 2718, 111 *L.Ed.*2d 30, 38 (1990), courts have adhered to the Supreme Court's interpretation of that clause in *Calder v. Bull*, 3 *Dall.* 386, 1 *L.Ed.* 648 (1798), limiting its scope to criminal legislation. Likewise, the Contract Clause nominally protects private parties against retroactive legislation impairing contractual relations. However, although the Contract Clause "was perhaps the strongest single constitutional check on state legislation during our early years as a Nation," *Allied Structural Steel Co. v. Spannaus*, 438 *U.S.* 234, 241, 98 *S.Ct.* 2716, 57 *L.Ed.*2d 727, 734

(1978), the clause has been construed narrowly in modern cases. *See, e.g., United States Trust Co. v. New Jersey*, 431 *U.S.* 1, 22–23, 97 *S.Ct.* 1505, 1518, 52 *L.Ed.*2d 92, 110 (1977) ("Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption. . . . [H]owever, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."); *Home Building & Loan Ass'n v. Blaisdell*, 290 *U.S.* 398, 444, 54 *S.Ct.* 231, 242, 78 *L.Ed.* 413, 432 (1934) (noting that "the reasonable exercise of the protective power of the state is read into all contracts"). Beyond the Contract Clause, the implied doctrine of separation of powers prohibits retroactive legislation that mandates a rule of decision in a pending case, *United States v. Klein*, 13 *Wall.* 128, 20 *L.Ed.* 519 (1871), or seeks to overturn a final decision of a United States Article III court. *Plaut v. Spendthrift Farm, Inc.*, 514 *U.S.* 211, 115 *S.Ct.* 1447, 131 *L.Ed.*2d 328 (1995).

 Those provisions are limited in application and are not implicated by the Disclosure Act. However, all statutes with retroactive elements, including the Disclosure Act, are subject to scrutiny under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the parallel provision of the New Jersey Constitution. *U.S. Const.* amend. XIV, § 1; *N.J. Const.* art. 1, ¶ 1. In prior cases, as noted, we have performed our due process analysis by asking whether retroactive application would interfere with a "vested right." *State Troopers, supra,* 149 *N.J.* at 54, 692 *A.*2d 519; *Phillips, supra,* 128 *N.J.* at 620, 608 *A.*2d 895.

Although the term "vested right" is a familiar one in the law, our courts have had difficulty in providing a clear and consistent definition of that term in the specific context of legislative retroactivity. This Court's most commonly cited definition—"a present fixed interest which ... should be protected against arbitrary state action," *Pennsylvania Greyhound Lines v. Rosenthal,* 14 *N.J.* 372, 384, 102 *A.*2d 587 (1954)—fairly can be viewed as

imprecise. Recently, we departed from the *Pennsylvania Grey-hound Lines* definition and construed "vested right" by reference to the impact of retroactive application on the disadvantaged party, noting that retroactive application generally does not violate due process unless the consequences are "particularly harsh or oppressive." *Twiss, supra,* 124 *N.J.* at 469–70, 591 *A.*2d 913 (quoting *Ventron, supra,* 94 *N.J.* at 499, 468 *A.*2d 150). Other opinions yet have sought to define the term "by stating what a 'vested right' is not: 'There can be no vested right in the continued existence of a statute or rule of the common law which precludes its change or repeal.' " *Phillips, supra,* 128 *N.J.* at 620, 608 *A.*2d 895 (quoting *Savarese v. New Jersey Auto. Full Ins. Underwriting Ass'n,* 235 *N.J.Super.* 298, 309, 562 *A.*2d 239 (App. Div.1989)); *see also Levin v. Township of Livingston,* 62 *N.J.Super.* 395, 404, 163 *A.*2d 221 (Law Div.1960), *aff'd in part, rev'd in part,* 35 *N.J.* 500, 173 *A.*2d 391 (1961) (declaring that "mere expectation as may be based upon an anticipated continuance of the present general laws" does not constitute a "vested right").

The difficulty in defining the term "vested right" may reflect ambiguities inherent in that term. As *Sutherland* notes:

> Writers who have analyzed the principle (retroactivity) under consideration, both in light of its historical aspects and contemporary decisions agree that neither the principle nor its off-spring, 'vested rights,' can be defined in terms which require only the application of logic to reach the right conclusion in a particular case. [Norman J. Singer, *Sutherland Statutory Construction* § 41.05 at 375 (5th ed.1992) (quotations omitted).]

Perhaps as a consequence, we noted in *Phillips v. Curiale, supra,* that "[d]iscerning commentators and judges have questioned the value of the vested rights analysis." *Phillips, supra,* 128 *N.J.* at 621, 608 *A.*2d 895 (quotations omitted). *See* James L. Kainen, *The Historical Framework for Reviving Constitutional Protection for Property and Contract Rights,* 79 *Cornell L.Rev.* 87, 102–03 (1993) (noting that "[t]he modern analysis treats the notion of vested rights as vacuous"); Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 *Harv. L.Rev.* 692, 696 (1960) ("[I]t has long been recognized that the term 'vested right' is conclusory—a right is vested when it has

been so far perfected that it cannot be taken away by statute."); Ray H. Greenblat, *Judicial Limitations on Retroactive Civil Legislation*, 51 *N.W. U.L.Rev.* 540, 561 (1956) (noting that "the vested rights approach is stultifying, for judicial analysis seems to end with scrutiny of the right").

The "vested rights" language must be understood in context. As one commentator has noted, principles of non-retroactivity played "a central role in the constitutional protection of property and contract rights" prior to the advent of substantive due process in *Lochner v. New York*, 198 *U.S.* 45, 25 *S.Ct.* 539, 49 *L.Ed.* 937 (1905). Kainen, *supra*, 79 *Cornell L.Rev.* at 103. Some protection was afforded through the United States Constitution by means of an expansive interpretation of the Contract Clause. *See, e.g., Piqua Branch of the State Bank of Ohio v. Knoop*, 16 *How.* 369, 14 *L.Ed.* 977 (1853) (striking statute repealing tax exemption); *Fletcher v. Peck*, 6 *Cranch* 87, 3 *L.Ed.* 162 (1810) (invalidating state statute that revoked prior statutory allocation of land). It was state constitutional law, however, and the equitable power of state courts that formed the basis of constitutional non-retroactivity jurisprudence. Kainen, *supra*, 79 *Cornell L.Rev.* at 107 (noting that state constitutional provisions "were interpreted to fill in the gaps by providing protection for vested rights against retrospective legislation that the federal constitution did not"); *see also* Thomas M. Cooley, *A Treatise on the Limitations Which Rest Upon the Legislative Power of the States in the American Union* 353 (2d ed. 1871) (collecting state non-retroactivity decisions and constitutional provisions).

States in the nineteenth century employed a variety of textual sources to protect vested rights. As Cooley noted, "the phrase 'due process (or course) of law' is sometimes used, and sometimes 'the law of the land,' and in some cases both; but the meaning is the same in every case." *Id.* at 353. Our early cases do not specify the textual source of the constitutional "vested rights" protection. It was not until 1941 that the Court of Errors and Appeals identified the "vested rights" protection as flowing from

the Due Process Clause of the United States Constitution and the corresponding provision in Article 1, Section 1 of the New Jersey Constitution. *Veix v. Seneca Building & Loan Ass'n of Newark,* 126 *N.J.L.* 314, 317, 19 *A.*2d 219 (E. & A. 1941). The variety—and in some cases the absence—of textual sources for the non-retroactivity doctrine compelled courts to formulate some qualifying principle for the exercise of judicial review of legislative retroactivity. The "vested rights" doctrine was that limitation. "In effect, the doctrine of vested rights narrowed the proscription against retroactive interference with economic rights, thereby preventing retroactivity from becoming an all-inclusive limitation that would effectively freeze the existing legal regime of contract and property rules." Kainen, *supra,* 79 *Cornell L.Rev.* at 105.

However, the vested rights doctrine was never an element of federal due process law. Until the United States Supreme Court's decision in *Lochner, supra,* the Due Process Clause was not construed to impose an independent restraint on retroactive laws. Although in the three decades after *Lochner* the Due Process Clause was held to impose limits on retroactive legislation, *see, e.g., Railroad Retirement Bd. v. Alton R. Co.,* 295 *U.S.* 330, 55 *S.Ct.* 758, 79 *L.Ed.* 1468 (1935) (voiding law requiring company to establish pension fund for employees whose tenure with company ended prior to passage of law); *Nichols v. Coolidge,* 274 *U.S.* 531, 47 *S.Ct.* 710, 71 *L.Ed.* 1184 (1927) (invalidating retroactive application of tax law), the decisions from that era were not directed by a search for "vested rights," and the principles that did appear in those decisions were relaxed in subsequent cases. *See, e.g., Ferguson v. Skrupa,* 372 *U.S.* 726, 731, 83 *S.Ct.* 1028, 1031, 10 *L.Ed.*2d 93, 97 (1963) (noting Supreme Court's "abandonment of the use of the 'vague contours' of the Due Process Clause to nullify laws which a majority of the Court believes to be economically unwise") (footnote omitted).

As we will explain below, the "vested rights" doctrine does not reflect the current understanding of anti-retroactivity principles implicit in the concept of due process. A consistent line of

decisions by the United States Supreme Court interpreting the Due Process Clause of the Fourteenth Amendment holds that retroactive legislation does not deprive parties of due process if the legislation "is supported by a legitimate legislative purpose furthered by rational means." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 *U.S.* 717, 729, 104 *S.Ct.* 2709, 2717–18, 81 *L.Ed.*2d 601, 611 (1984). Those decisions do not engage in a "vested rights" inquiry. The standard they apply—the familiar "rational basis" test—is the same standard that is applied to legislation generally when challenged on due process grounds.

The principal contemporary decision on the due process implications of retroactive legislation is *Usery v. Turner Elkhorn Mining Co.*, 428 *U.S.* 1, 96 *S.Ct.* 2882, 49 *L.Ed.*2d 752 (1976). In *Usery*, the Supreme Court upheld the retroactive effects of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, against the industry's claim that the retroactive application of the statute violated due process. Under Title IV of that Act, coal mine operators were required to compensate former employees disabled by pneumoconiosis even though those employees had terminated their work in the industry before the Act was passed.

Citing a string of post-*Lochner* cases, the *Usery* Court found it "well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality." *Id.* at 15, 96 *S.Ct.* at 2892, 49 *L.Ed.*2d at 752 (citing *Ferguson v. Skrupa, supra*, 372 *U.S.* at 731, 83 *S.Ct.* at 1031, 10 *L.Ed.*2d at 97; *Williamson v. Lee Optical Co.*, 348 *U.S.* 483, 487–88, 75 *S.Ct.* 461, 99 *L.Ed.* 563 (1955)). The Court emphasized that "[i]t does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Id.* at 16–17, 96 *S.Ct.* at 2893, 49 *L.Ed.*2d at 752. Nevertheless, the standard of review enunciated by the Court was the deferential "rational basis"

standard applied to economic legislation generally: "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Id.* at 15, 96 *S.Ct.* at 2892, 49 *L.Ed.*2d at 752.

The standard enunciated in *Usery* has been applied consistently by the United States Supreme Court in subsequent cases. *Eastern Enterprises v. Apfel,* 524 *U.S.* 498, 540, 118 *S.Ct.* 2131, 2154, 141 *L.Ed.*2d 451, 486 (1998) (Kennedy, J., concurring); *United States v. Carlton,* 512 *U.S.* 26, 31, 114 *S.Ct.* 2018, 2022, 129 *L.Ed.*2d 22, 28 (1994); *General Motors Corp., supra,* 503 *U.S.* at 191, 112 *S.Ct.* at 1111, 117 *L.Ed.*2d at 340; *United States v. Sperry Corp.,* 493 *U.S.* 52, 64–65, 110 *S.Ct.* 387, 396, 107 *L.Ed.*2d 290, 304 (1989); *National R.R. Passenger Corp. v. Atchison Topeka and Santa Fe Ry. Co.,* 470 *U.S.* 451, 472, 105 *S.Ct.* 1441, 1455, 84 *L.Ed.*2d 432, 450 (1985); *Pension Benefit Guaranty Corp., supra,* 467 *U.S.* at 729, 104 *S.Ct.* at 2717–18, 81 *L.Ed.*2d at 611. Consistent with those decisions, we are disinclined to pursue a "vested rights" inquiry in determining whether Section 10(c) of the Disclosure Act violates plaintiffs' rights under the Due Process Clause. Accordingly, in place of the "vested rights" inquiry we will apply rational basis scrutiny, as that standard has been articulated by the United States Supreme Court in its contemporary legislative retroactivity decisions. If Section 10(c) "is supported by a legitimate legislative purpose furthered by rational means," *Pension Benefit Guaranty Corp., supra,* 467 *U.S.* at 729, 104 *S.Ct.* at 2717–18, 81 *L.Ed.*2d at 611, it will withstand a due process challenge.

We find the constitutional question under the *Usery* standard to be a close one. The retroactivity provision suggests a conclusion on the part of the Legislature that the public interest in protecting real estate sellers and developers from consumer fraud claims under the standard we enunciated in *Strawn, supra,* 140 *N.J.* at 65, 657 *A.*2d 420, outweighed the interests of homeowners in a remedy for the non-disclosure of off-site conditions affecting the value of their properties. On the other hand, the disclosure scheme created in Sections 6, 8 and 9 of the Disclosure Act

reaffirms the basic principle of *Strawn*—that home purchasers are entitled to disclosure of information respecting off-site conditions that may affect the value of their properties. It is difficult to conceive of a rationale to explain why plaintiffs should be deprived of a protection that they would have enjoyed if they either resolved their claims before or purchased their properties after the Disclosure Act was implemented. Although our constitutional review is a limited one, *see Eastern Enterprises, supra,* 524 *U.S.* at 550, 118 *S.Ct.* at 2159, 141 *L.Ed.*2d at 488 (Kennedy, J., concurring) ("Statutes may be invalidated on due process grounds only under the most egregious of circumstances."), the argument that Section 10(c) produced an "arbitrary and irrational" result, *Usery, supra,* 428 *U.S.* at 15, 96 *S.Ct.* at 2892, 49 *L.Ed.*2d at 752, has merit.

We need not, however, resolve the constitutional question in this appeal. As noted, notwithstanding the absence of a constitutional violation, we may decline to apply a statute retroactively if retroactive application would result in "manifest injustice." Because, as we will discuss, we find a clear manifest injustice in the retroactive application of the Disclosure Act in this case, we decline to resolve the much closer constitutional question.

B

We turn, then, to the "manifest injustice" prong of our retroactivity inquiry. The "manifest injustice" test "does not flow from constitutional requirements, but instead is based on equitable concerns." *Edgewater, supra,* 103 *N.J.* at 239, 510 *A.*2d 1178 (citing *Ventron, supra,* 94 *N.J.* at 498, 468 *A.*2d 150). The standard is broader than that afforded by the constitution. As we stated in *In re D.C.:*

> The concern that is implicated by the standard of "manifest injustice" in assessing the retroactive application of a statute need not reach constitutional levels. Hence, while our inquiry into whether there has been a "manifest injustice" is informed by our consideration of issues of constitutional due process, it is not necessarily determined by those issues.
>
> [*In re D.C., supra,* 146 *N.J.* at 58, 679 *A.*2d 634.]

*See also State Troopers, supra,* 149 *N.J.* at 54, 692 *A.*2d 519 (noting that "manifest injustice analysis is a nonconstitutional, equitable doctrine designed to prevent unfair results that do not necessarily violate any constitutional provision").

We have discussed the historical growth of the legal tradition against retroactivity. In large part, that tradition has developed from equitable principles. *See* 1 J. Kent, *Commentaries on American Law* 455 (2d ed. 1832) (noting that rule against retroactive application was "founded not only in English law, but on the principles of general jurisprudence"). We made explicit the equitable element of our retroactivity jurisprudence two decades ago in *Gibbons v. Gibbons, supra,* 86 *N.J.* at 523–25, 432 *A.*2d 80. There, we upheld the retroactive application of an amendment to the divorce statute, *N.J.S.A.* 2A:34–23. After determining that the statute was otherwise subject to retroactive application, we defined the scope of the "manifest injustice" inquiry as follows:

[T]he essence of this inquiry is whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively.

[*Id.* at 523–24, 432 *A.*2d 80.]

We found in *Gibbons* that there was no manifest injustice because the statute allowed orders pertaining to alimony or other support to be revised "as circumstances may require." *Id.* at 525, 432 A.2d 80 (quoting *N.J.S.A.* 2A:34–23).

 Unlike the "vested rights" analysis, we have experienced no unique difficulty defining the contours of the manifest injustice standard, and we reaffirm that standard today. We have applied the manifest injustice analysis sparingly in prior cases, incorporating it to defeat application of a retroactive law only once. *State Troopers, supra,* 149 *N.J.* at 56, 692 *A.*2d 519 (finding manifest injustice in retroactive application of administrative regulation amending back-pay rule because of "reasonable reliance" by employees on pre-amendment rule in determining when to retire or resign from employment). Given the unique circumstances of this

case, however, we are compelled to conclude that applying the Disclosure Act retroactively to bar plaintiffs' claims would constitute manifest injustice.

The manifest injustice analysis requires "a weighing of the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance." *Nelson v. Board of Educ. of Tp. of Old Bridge,* 148 *N.J.* 358, 371, 689 *A.*2d 1342 (1997). Edison Glen argues that plaintiffs did not "rely" on the law that was changed by the Disclosure Act because plaintiffs purchased their properties prior to our decision in *Strawn, supra.* We agree that reliance is a critical element of the manifest injustice analysis, but we are not persuaded that plaintiffs did not rely on a legal responsibility of Edison Glen to disclose material off-site conditions when they purchased their properties simply because we had not yet decided *Strawn.* The *Strawn* holding was not a radical change in the law. It was arrived at on the basis of the text of a statute—the Consumer Fraud Act—that was enacted prior to the real estate purchases in this case, and, with respect to the common law claims, the practical application of pre-existing common law principles of this State and other jurisdictions. *Strawn, supra,* 140 *N.J.* at 58–65, 657 *A.*2d 420 (applying common law precedent). We note that the Appellate Division, in an opinion by Justice Coleman (then a member of that court), had reached the same conclusion as had our Court. *Strawn v. Canuso,* 271 *N.J.Super.* 88, 638 *A.*2d 141 (App.Div.1994). Parties are not required to refer to a decision precisely on point to demonstrate reliance for purposes of the manifest injustice inquiry. Plaintiffs reasonably could have relied on the cases and statutory provisions that formed the basis of our holding in *Strawn,* and were in existence when they purchased their properties.

Indeed, the Legislature approved of *Strawn*'s basic holding when it enacted the Disclosure Act, noting in the Assembly Committee Statement that the purpose of the Act was to "define[ ] in its entirety the duty to disclose" identified by *Strawn* "and

those actions necessary to fulfill such duty." Assembly Housing Committee, *Statement to Assembly Committee Substitute for Assembly Bill No. 2646* (June 8, 1995). This case is distinguishable, therefore, from *Phillips v. Curiale, supra*, 128 *N.J.* 608, 608 *A.*2d 895. In that case, we found that the plaintiff could not have relied, for purposes of the manifest injustice analysis, on an earlier decision in which we held that National Guard members injured in the line of duty could sue fellow guard members for negligence (unless the defendants were complying with a lawful order), because in the earlier decision we recognized the "anomalous result" produced by our holding—that the fellow guard members might be held liable while the State remained immune—and "invited legislative response" to correct the underlying law. *Phillips, supra*, 128 *N.J.* at 626, 608 *A.*2d 895 (citing *Phillips v. State*, 98 *N.J.* 235, 486 *A.*2d 318 (1985)).

The basic principle of *Strawn*—that purchasers of real estate are entitled to know about material off-site conditions—was both deducible from prior precedent and reaffirmed by the Legislature in the Disclosure Act itself. We perceive sufficient reliance on pre-existing law in this case to implicate the manifest injustice analysis.

As noted, in order to determine whether relief from retroactive application should be afforded, we must weigh plaintiffs' reliance against the detriment that Edison Glen would suffer if the Disclosure Act did not bar plaintiffs' Consumer Fraud Act and common law claims. *Nelson, supra*, 148 *N.J.* at 371, 689 *A.*2d 1342; *Edgewater, supra*, 103 *N.J.* at 240, 510 *A.*2d 1178 (noting that "manifest injustice" inquiry involves "weighing process"). "In the modern context, a key element in evaluating retroactive change is whether the Legislature has denied a claimant all remedies or has modified available remedies." *Phillips, supra*, 128 *N.J.* at 626, 608 *A.*2d 895.

Edison Glen contends that plaintiffs would not suffer manifest injustice because they had an alternative claim under PREDFDA. As noted, PREDFDA regulations require a seller of real estate to

disclose a property's proximity to "airports or flight paths, railroads, noisy or polluting industrial use or other similar forces." *N.J.A.C.* 5:26–4.2(a)(17). The private remedies provision in PREDFDA includes a six-year statute of limitation, which runs from the time each plaintiff makes their first payment to the defendant, and does not include a tolling provision. *N.J.S.A.* 45:22A–37(d). Plaintiffs contend that they were not aware that their property values were affected by the toxic waste sites until November 1996, and, according to plaintiffs' complaint, all but one of the sixty-one named plaintiffs purchased their property in mid–1990 or earlier. Accepting those facts, only one of the home purchasers would have had the opportunity to file a PREDFDA claim within the limitations period. Clearly, if any plaintiffs were barred from bringing a claim under PREDFDA, that statute does not offer to those parties an independent remedy for purposes of the manifest injustice analysis.

Nevertheless, because of the limited record before us, we direct the trial court on remand to determine which, if any, of the homeowners could have pursued a PREDFDA claim within the limitations period set forth in that law. If any homeowners could have pursued such a claim, the trial court should apply the Disclosure Act retroactively to those parties because the availability of a PREDFDA claim demonstrates that retroactive application of the Disclosure Act would not result in manifest injustice. PREDFDA imposes double-damages for developers who "omit[ ] a material fact from any application for registration," *N.J.S.A.* 45:22A–37, and that is an adequate remedy for purposes of our retroactivity analysis.

In the likely event that most plaintiffs are barred from bringing a PREDFDA claim, we find detrimental reliance in this case to be clear. Retroactive application of the Disclosure Act would deprive those plaintiffs of any remedy for violation of a right—the right to disclosure—that the Disclosure Act itself affirms, although in a different manner than that specified in *Strawn*. We find it manifestly unjust to deprive plaintiffs of the right to notification

merely because they suffer the misfortune of standing in the window of time between, on the one hand, cases resolved before the Disclosure Act was passed (which Section 10(c) does not reach) and, on the other hand, cases brought after the Act's notification scheme was implemented. Accordingly, we hold that those plaintiffs who were barred from filing a PREDFA claim at the time they first became aware of the diminution of their property values may maintain their common law and Consumer Fraud Act causes of action notwithstanding the retroactivity provisions of the Disclosure Act.

## V

We modify the judgment of the Appellate Division, and remand the matter to the Law Division for further proceedings consistent with this opinion.

*For Modification and Remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LaVECCHIA and ZAZZALI—5.

*Opposed*—None.