NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-3950-19T4
A-3975-19T4
A-3985-19T4
A-3987-19T4
A-4002-19T4

In re ATTORNEY GENERAL
LAW ENFORCEMENT
DIRECTIVE Nos. 2020-5 and
2020-6

APPROVED FOR PUBLICATION

October 16, 2020

APPELLATE DIVISION

Argued September 16, 2020 – Decided October 16, 2020

Before Judges Ostrer, Accurso and Vernoia.

On appeal from Attorney General Law Enforcement
Directive Nos. 2020-5 and 2020-6.

James M. Mets and Robert R. Cannan argued the
cause for appellant in A-3950-19 (Mets Schiro &
McGovern, LLP and Markman & Cannan, LLC,
attorneys; James M. Mets and Robert R. Cannan, of
counsel and on the briefs; Brian J. Manetta, on the
brief).

Carl J. Soranno and Jay Sabin argued the cause for
intervenors-appellants in A-3950-19 and A-3975-19
(Brach Eichler, LLC, attorneys; Anthony M. Rainone
and Carl J. Soranno, of counsel and on the briefs; Jay
Sabin, on the briefs).

D. John McAusland argued the cause for appellants in A-3975-19 (Attorneys Hartman, Chartered, Law Offices of Robert A. Ebberup, LLC, Law Office of D. John McAusland and Loccke, Correia & Bukosky, attorneys; Mark A. Gulbranson, Jr., Katherine D. Hartman, Robert A. Ebberup, D. John McAusland and Michael A. Bukosky, on the briefs).

Frank M. Crivelli argued the cause for appellants in A-3985-19 (Crivelli & Barbati, LLC, attorneys; Frank M. Crivelli, on the briefs).

Kevin D. Jarvis argued the cause for appellant in A-3987-19 (O'Brien, Belland & Bushinsky, LLC, attorneys; Kevin D. Jarvis and Matthew B. Madsen, on the briefs).

Paul L. Kleinbaum and Matthew Areman argued the cause for appellants in A-4002-19 (Zazzali, Fagella, Nowak, Kleinbaum & Friedman, and Markowitz & Richman, attorneys; Paul L. Kleinbaum and Matthew Areman, of counsel and on the briefs; Craig A. Long, on the briefs).

Jeremy M. Feigenbaum argued the cause for respondents in all appeals (Jeremy M. Feigenbaum, State Solicitor, and Jane C. Schuster, Assistant Attorney General, of counsel and on the brief; Emily Marie Bisnauth, Christopher Weber, Dominic L. Giova, Sean P. Havern and Brandon C. Simmons, Deputy Attorneys General, on the brief).

Vito A. Gagliardi, Jr., argued the cause for amicus curiae New Jersey State Association of Chiefs of Police (Porzio, Bromberg & Newman PC, attorneys; Vito A. Gagliardi, Jr., of counsel; David L. Disler and Thomas J. Reilly, on the brief).

Alexander R. Shalom argued the cause for amici curiae American Civil Liberties Union of New Jersey, Bayard Rustin Center for Social Justice, Cherry Hill Women's Center, Ethical Culture Society of Bergen County, Faith in New Jersey, Latino Action Network, LatinoJustice PRLDEF, Legal Advocacy Project of UU FaithAction New Jersey, Libertarians for Transparent Government, National Association for the Advancement of Colored People New Jersey State Conference, NAACP Newark, National Organization for Women of New Jersey, Newark Communities for Accountable Policing, New Jersey Alliance for Immigrant Justice, New Jersey Campaign for Alternatives to Isolated Confinement, New Jersey Clergy Coalition for Justice, New Jersey Institute for Social Justice, Partners for Women and Justice, People's Organization for Progress, Salvation and Social Justice, Service Employees International Union 32BJ, SPAN Parent Advocacy Network, Volunteer Lawyers for Justice, and Women Who Never Give Up (Jeanne LoCicero, Alexander Shalom, Karen Thompson and Molly K.C. Linhorst, on the brief).

CJ Griffin argued the cause for amici curiae National Coalition of Latino Officers and Law Enforcement Action Partnership (Pashman Stein Walder Hayden, P.C., attorneys; CJ Griffin, of counsel and on the brief).

Joseph E. Krakora argued the cause for amici curiae New Jersey Office of the Public Defender and Association of Criminal Defense Lawyers of New Jersey (Joseph E. Krakora, Public Defender, attorney; and Gibbons P.C., attorneys; Lawrence Lustberg and Michael R. Noveck, on the brief).

New Jersey State Office of the Public Defender (Lawrence Lustberg and Michael R. Noveck, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Responding to state and national demands for accountability and reform of law enforcement following the death of George Floyd at the hands of Minneapolis police, Attorney General Gurbir S. Grewal announced in June that he would end New Jersey's decades-long practice of shielding the identities of law enforcement officers receiving major discipline for misconduct. Determining he could best improve the public's trust in state and local police by instilling greater accountability in the processes that govern officer misconduct, the Attorney General issued two directives, Law Enforcement Directive Numbers 2020-5 and 2020-6, amending the statewide rules for internal affairs investigations, known as the Internal Affairs Policy and Procedures (IAPP), applicable to every law enforcement agency in New Jersey by virtue of N.J.S.A. 40A:14-181, and imposing additional requirements on the law enforcement agencies housed within the Department of Law and Public Safety.

A-3950-19T4

Directive 2020-5 amends the IAPP to require every law enforcement agency in the State to publish a synopsis of all complaints in which an officer received final discipline of termination, demotion, or a suspension of more than five days, including the name of the officer, a summary of the misconduct, and the sanction imposed. Initial reports, covering all discipline imposed during this calendar year, are due by December 31, 2020. Subsequent reports must be published at least annually thereafter. The Directive further permits, but does not require, county and municipal agencies to release similar information about earlier incidents of officer misconduct resulting in the same sanctions.

Directive 2020-6 orders all law enforcement agencies within the Department of Law and Public Safety, which the Attorney General heads, the Division of State Police and the Division of Criminal Justice, as well as the Juvenile Justice Commission, which is in but not of the Department, to publish no later than July 15, 2020, the same information required by Directive 2020-5 from January 1, 2000 to the present. The Directive orders the three agencies to provide notice to each officer it intends to identify at least seven days prior to publication, whenever possible making reasonable efforts. Both Directives provide they were issued pursuant to the Attorney General's authority to ensure

A-3950-19T4

the uniform and efficient enforcement of the laws and administration of criminal justice throughout the State, and specific to 2020-6, his authority to supervise the operations of the Department of Law and Public Safety, and create no substantive right of enforcement in any third party.

These five consolidated appeals present a broad-based facial challenge to the Directives by petitioners State Troopers Fraternal Association of New Jersey (A-3950-19), and intervenors Association of Former New Jersey State Troopers, The New Jersey Former Troopers Heritage Foundation, Inc., and Former Trooper Members and FTA Members No. 1 & 2 (A-3950-19 and A-3975-19); State Troopers Non-Commissioned Officers Association of New Jersey, and State Troopers Superior Officers Association of New Jersey, and their current respective presidents, Pete J. Stilianessis and Richard Roberts (A-3975-19); Policemen's Benevolent Association Local Number 105, PBA Local Number 383, PBA Local Number 383A, PBA Local Number 383B, and The New Jersey Law Enforcement Supervisors Association (A-3985-19); New Jersey Superior Officers Law Enforcement Association (A-3987-19); and New Jersey State Policemen's Benevolent Association and New Jersey State Lodge of the Fraternal Order of Police, and their current respective presidents, Patrick Colligan and Robert W. Fox (A-4002-19).

6

Petitioners and intervenors, representing a broad swath of the State's 36,000 active law enforcement officers as well as some retired officers, contend the Attorney General lacks the authority to issue the Directives because they conflict with a provision of the Open Public Records Act, N.J.S.A. 47:1A-10 (section 10), a regulation promulgated by the Department of Law and Public Safety, N.J.A.C. 13:1E-3.2(a)(4), and various Executive Orders, most notably Executive Order 11 (Byrne), all of which protect the confidentiality of personnel records of public employees. Petitioners also maintain the Attorney General promulgated the Directives in violation of the Administrative Procedures Act and acted outside his authority by giving them retroactive application; that the Directives violate the equal protection rights of affected officers; violate the due process rights of affected officers; violate officers' constitutional rights to collective negotiations and against the impairment of contracts; violate the doctrines of promissory and equitable estoppel; and, finally, that the Directives are arbitrary, capricious and unreasonable and against public policy.

We granted several petitioners leave to file emergent applications to stay implementation of the Directives pending their appeal. We subsequently entered a stay, over objection by the Attorney General, in order to preserve

7                                                                   A-3950-19T4

petitioners' challenge pending our disposition and accelerated the appeals in light of the pressing public interest. We thereafter consolidated the appeals on the Attorney General's motion.

We also granted the motion of the New Jersey State Association of Chiefs of Police to appear as amicus curiae in support of petitioners' arguments against the Directives. The Association, whose members are responsible for the day-to-day operations of police departments throughout the State, echo petitioners' claim that the Directives undermine long-standing public policy, embodied in section 10 of OPRA and N.J.A.C. 13:1E-3.2(a)(4), regarding the confidentiality of the internal affairs process and protecting the identity of officers who are disciplined. The Association further argues the Directives are arbitrary and capricious because they are not designed to achieve the Attorney General's stated goals. In particular, the Association claims the Directives do not limit the discipline requiring the release of names to instances where officers violated the public trust and unnecessarily extend to former officers, because officers seeking to transfer between law enforcement agencies are subjected to thorough background checks — that would reveal any prior discipline — before being hired.

A-3950-19T4

We also granted the motions of several other organizations for amicus status arguing in support of the Directives. Amicus American Civil Liberties Union of New Jersey argues making police discipline records public, including historic records, provides citizens with critical information about both officers and departments, and that transparency promotes confidence in police, which in turn promotes community trust in law enforcement institutions. ACLU-New Jersey also notes that complaints made against other regulated professionals and tradespeople in New Jersey are public, including those against lawyers, judges, plumbers and manicurists, and that other states have made police discipline records public without the negative consequences about which appellants warn.

Amicus ACLU-New Jersey makes those arguments on behalf of itself and its members, as well as the Bayard Rustin Center for Social Justice, the Cherry Hill Women's Center, the Ethical Culture Society of Bergen County, Faith in New Jersey, the Latino Action Network, LatinoJustice PRLDEF, the Legal Advocacy Project of UU FaithAction New Jersey, Libertarians for Transparent Government, the National Association for the Advancement of Colored People, New Jersey State Conference, NAACP Newark, the National Organization for Women of New Jersey, Newark Communities for

9

Accountable Policing, the New Jersey Alliance for Immigrant Justice, the New Jersey Campaign for Alternatives to Isolated Confinement, New Jersey Clergy Coalition for Justice, the New Jersey Institute for Social Justice, Partners for Women and Justice, the People's Organization for Progress, Salvation and Social Justice, Service Employees International Union 32BJ, SPAN Parent Advocacy Network, Volunteer Lawyers for Justice, and Women Who Never Give Up.

Amici Association of Criminal Defense Lawyers of New Jersey and the New Jersey State Office of the Public Defender argue the Directives promote enhanced access in criminal cases to the discovery of prior police misconduct. They contend information about such misconduct is admissible, relevant evidence relating to an officer's credibility, particularly in light of the recent amendment to N.J.R.E. 608, and that such discovery is consistent with New Jersey's broad, open-file discovery rules and with the State's constitutional obligation to produce exculpatory evidence. They maintain the current failure to name police officers who engage in misconduct inhibits discovery of relevant police misconduct records and creates substantial risk of erroneous charges and convictions. These amici argue that by linking officers to their specific acts of misconduct, the Directives promote discovery of evidence that

can be used at all stages of the criminal justice process, from charging decisions to post-conviction relief, thereby improving the administration of justice. They note that release of historical information of misconduct could be especially important to those individuals wrongly convicted and pursuing post-conviction relief.

Finally, amici National Coalition of Latino Officers and the Law Enforcement Action Partnership argue that when internal affairs and disciplinary information is kept secret, the community has no way of knowing whether investigations are thorough and fair and whether officers are properly held accountable for their actions. When communities are deprived of such information, it leads them to believe internal affairs complaints are not taken seriously, and that misconduct is swept under the rug, causing them to distrust the police. These amici contend that when police departments have not earned the community's respect, it makes the jobs of all police officers much more difficult and dangerous. They also argue that transparency will expose disparities in discipline and allow the public — and officers — to see whether discipline is imposed consistently, which will particularly benefit Black and Latino officers and women who work in law enforcement agencies that are overwhelmingly white and male. These amici contend the Directives will

A-3950-19T4

expose suspected disparities, better protect minority officers from discrimination and retaliation and improve the disciplinary system for all officers.

Having reviewed the Directives, considered the briefs filed by the parties and amici, and heard extensive oral argument by very able advocates, we conclude the Attorney General acted within the authority conferred on him by the Legislature in the Law and Public Safety Act of 1948, the Criminal Justice Act of 1970, and N.J.S.A. 40A:14-181 in issuing Directives 2020-5 and 2020-6, and they therefore withstand petitioners' facial challenge. See In re Stallworth, 208 N.J. 182, 194-95 (2011) (noting review of agency decisions is limited to determining whether the decision violated express or implied legislative policies, whether the record contains adequate support for the findings and whether the agency clearly erred by reaching a conclusion that could not reasonably have been reached). We do not pass on the wisdom of the policy embodied in these Directives, which appellants assail as an imprudent overreaction to recent events that will needlessly shame officers, put their safety and that of their families at risk, disclose sensitive medical information and possibly identify the victims of domestic violence.

The erosion of confidence in our law enforcement agencies is a serious problem, and it is enough that the Attorney General, New Jersey's chief law enforcement officer tasked with the general supervision of criminal justice in our State, has determined that publishing the names of officers incurring major discipline for misconduct will increase public trust in those agencies and make them more accountable to the communities they serve. It is not for this court to assess the Attorney General's policy choice. Our only focus is on his authority to implement the policy choice he has made.

The Attorney General has candidly acknowledged the sea change these Directives represent in his Department's approach to publication of the names of law enforcement officers subject to final discipline for serious misconduct. As appellants note, the Attorney General was only three months ago in our Supreme Court arguing against the release of the name of a trooper separated from the State Police in 2015 for "acting in an unofficial capacity to the discredit of the Division while off-duty by having questionable associations, engaging in racially offensive behavior and publicly discussing police patrol procedures." See Libertarians for Transparent Gov't v. State Police, 239 N.J. 518 (2019) (granting plaintiff's petition for certification as to whether section 10 requires disclosure of the name of a state trooper listed in the Office of

Professional Standard's annual report to the Legislature as having been terminated for misconduct). Following the filing of these appeals, the Attorney General released the name of that trooper, which it had successfully shielded from disclosure in the Law Division and this court, settled that suit, and the parties dismissed the appeal pending in the Supreme Court. Libertarians for Transparent Gov't v. State Police, __ N.J. __ (2020).

Although we are convinced of the Attorney General's authority to release the names of law enforcement officers receiving major discipline, including those having incurred the discipline in or after 2000 but before issuance of Directives 2020-5 and 2020-6, and thus uphold the facial validity of the Directives, appellants have raised issues about the retrospective application of the Directives to particular individuals that cannot be resolved on these appeals. The Attorney General conceded at oral argument that individual officers may have contract rights arising out of prior specific settlements of internal discipline, and we think it possible some may have other claims and concerns about how these new directives apply to them. Our conclusion that the Directives constitute a valid exercise of the Attorney General's authority does not preclude any officer from bringing an as-applied challenge to

14

publication of his or her name pursuant to Directives 2020-5 and 2020-6 for discipline finalized before release of those Directives.

**The Attorney General's Authority over the Department of Law and Public Safety, Internal Affairs and the IAPP.**

The Attorney General is New Jersey's "chief law enforcement officer," N.J.S.A. 52:17B-98, and head of the Department of Law and Public Safety, N.J.S.A. 52:17B-2. Prado v. State, 186 N.J. 413, 422 (2006). "[I]n order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice," the Legislature in the Criminal Justice Act of 1970, N.J.S.A. 52:17B-97 to -117, "declared [it] to be the public policy of this State to encourage cooperation among law enforcement officers and to provide for the general supervision of criminal justice by the Attorney General." N.J.S.A. 52:17B-98.

As part of his supervisory obligations for the Department of Law and Public Safety under the Law and Public Safety Act of 1948, the Attorney General is charged with "formulat[ing] and adopt[ing] rules and regulations for the efficient conduct of the work and general administration of the department, its officers and employees," N.J.S.A. 52:17B-4(d). See In re Carberry, 114 N.J. 574, 578 (1989). Attorney General Del Tufo in 1991 exercised that authority, as well has his authority under the Criminal Justice Act of 1970,

N.J.S.A. 52:17B-98, in establishing the first IAPP, which set forth standards, policies and procedures for the internal affairs function for the State's law enforcement agencies, including the establishment of "a viable process for the receipt and investigation of citizen complaints concerning police conduct." See Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark, __ N.J. __ (2020) (slip op. at 33).

In 1996, the Legislature required police departments to adopt and implement guidelines consistent with the IAPP in N.J.S.A. 40A:14-181. As our Supreme Court recently noted, "[s]ection 181 effectively made the AG's IAPP required policy for all municipal law enforcement agencies in New Jersey." Fraternal Order of Police, __ N.J. at __ (slip op. at 34).

The IAPP, which has been amended several times over its nearly thirty years' existence, has always stressed the importance of the confidentiality of internal affairs processes and investigations. In its first iteration in 1991, the IAPP provided that "[t]he progress of internal affairs investigations and all supporting materials are considered confidential information." 1991 IAPP at 15. The 2019 revision likewise provides that "[t]he nature and source of internal allegations, the progress of internal affairs investigations, and the resulting materials are confidential information." 2019 IAPP at 9.6.1. The

A-3950-19T4

Attorney General continues to maintain that confidentiality is critical to the integrity of internal investigations and necessary to protect the privacy of complainants and witnesses. He also notes, however, that his predecessors have made clear that this confidentiality has limits.

Specifically, Attorney General Grewal points to the first IAPP issued in 1991, which, while requiring the contents of IA files to be "clearly marked as confidential" and kept under lock and key in the IA unit, also empowered the police executive "to release publicly the details of an internal investigation or disciplinary action." 1991 IAPP at 15. Further, in addition to requiring that officers subject to an IA investigation be provided with a copy of the decision and accompanying findings, every iteration of the IAPP has also required complainants to be notified of the disposition of his or her complaint and provided an explanation for the outcome. See 1991 IAPP at 15; 1992 IAPP at 15; 2000 IAPP at 11-6; 2011 IAPP at 24-25; 2014 IAPP at 22; 2019 IAPP at 6.3.16-6.3.18.

The 2000 version of the IAPP issued by Attorney General Farmer reiterated the emphasis on the confidentiality of "the nature and source of internal allegations" and "the progress of internal affairs investigations," requiring that "[t]he contents of the internal investigation case files shall be

retained in the internal affairs unit and clearly marked as confidential." 2000

IAPP at 11-46. It also made explicit what was previously only implied, that is,

that the "information and records" of internal investigations could be released

at the direction of the Attorney General or responsible county prosecutor.

Ibid. In contrast, the 2000 version also clarified that the ability of the law

enforcement executive to authorize release of confidential internal affairs

information was limited to a particular file or record and subject to a "good

cause" standard. Ibid. Every version of the IAPP since has contained identical

language permitting the Attorney General to release information and records of

internal affairs investigations without qualification.

**Public Reporting of Complaints Against Law Enforcement.**

Every iteration of the IAPP has required local law enforcement agencies

to make available to the public an annual report, statistical in nature,

summarizing the types of complaints received and the dispositions of those

complaints. In the 2011 version of the IAPP, each agency became additionally

obligated to "periodically release a brief synopsis of all complaints where a

fine or suspension of ten days or more was assessed to a member of the

agency." 2011 IAPP at 50. Until the Attorney General amended the 2019

version of the IAPP by Directive 2020-5, those public reports, now required to

be published on the agency's website, were not to include "the names of . . . subject officers."  See 2019 IAPP at 9.11.1.

In 2001, the Legislature required the State Police to begin filing annual reports of complaints of misconduct by troopers made by members of the public.  N.J.S.A. 53:1-10.1 provides "[i]t shall be the duty of the Superintendent of State Police to compile and submit to the Governor and the Legislature an annual report with regard to complaints of misconduct made by members of the public against members of the State Police."  The Senate Judiciary Committee statement to the bill noted the Division of State Police did not then "disclose any information concerning complaints by members of the public of misconduct on the part of State Police officers," and that the bill "mirror[ed] the present reporting requirements applicable to local law enforcement agencies with regard to civilian complaints."  Senate Judiciary Comm. Statement to S. 650 (Jan. 31, 2000).  The statute, like the IAPP it mirrored prior to its recent amendment by Directive 2020-5, prohibits the report from disclosing the identity of troopers accused of, or sanctioned for, misconduct.  N.J.S.A. 53:1-10.1 ("The report shall be a statistical compilation and shall not disclose personal identifiers of either the complainant or the member of the State Police.").

A-3950-19T4

Appellant, New Jersey Superior Officers Law Enforcement Association, has included in its appendix copies of several of the annual reports prepared by the Division's Office of Professional Standards pursuant to N.J.S.A. 53:1-10.1. In addition to explaining how the disciplinary system operates, the reports include statistical summaries of complaints, classified by type, and compared across years, as well as summary descriptions of completed discipline for violations resulting in suspensions exceeding five days. Those summary descriptions are brief statements identifying the violations, synopsizing the misconduct, and noting the discipline imposed. They do not identify the trooper disciplined.

A typical example of these summaries, and one the Attorney General has already litigated in Libertarians for Transparent Government v. State Police, is from the 2015 report, where it appears among instances of major discipline. It provides:

> Member pled guilty to acting in an unofficial capacity to the discredit of the Division while off-duty by having questionable associations, engaging in racially offensive behavior and publicly discussing police patrol procedures. The member was required to forfeit all accrued time and separate from employment with the Division.

As several appellants refer to this particular matter in their briefs and it provides a convenient example of the disciplinary information the Attorney General seeks to release to the public by Directives 2020-5 and 2020-6, we include it here and discuss it further below.

**Directives 2020-5 and 2020-6**

In Directive 2020-5, "Requiring Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations," the Attorney General notes that "[f]or decades, New Jersey has treated a police department's internal disciplinary files — generally known as 'internal affairs' records — as highly confidential, in line with the way that personnel records for all public employees are usually treated." He acknowledged the "good reasons why internal affairs records are not generally disclosed to the public, including the need to protect those who report and witness police misconduct," and the unfairness of "publicly disclos[ing] unproven allegations against officers."

He also notes, however, that "law enforcement officers are entrusted with extraordinary responsibility," making it "imperative" that they "maintain the highest standards of good discipline and conduct." The Attorney General explained that degree of responsibility provides "a stronger rationale for public

disclosure" when a law enforcement agency makes a final determination an officer "has violated agency rules in a way that warrants professional sanctions."  And, he concluded, "the more significant the violation, the more important it is that the public knows about the misconduct."

The Attorney General reviewed the changes he made in the December 2019 revision to the IAPP, which "strengthened oversight of internal affairs" and allowed internal affairs files to be shared with civilian review boards with procedural safeguards, which he characterized as "one of the most substantial revisions to IAPP since its initial publication," and "a significant step forward in promoting accountability and strengthening public confidence in law enforcement."  Among the changes he highlighted was the requirement in IAPP 2019 at 9.11.2, that all local law enforcement agencies publish annually on their websites a synopsis summarizing all disciplinary complaints, whether by members of the public or internal to the agency, resulting in an officer receiving a fine or suspension of ten days or more but not requiring the identity of the officer be disclosed.

Explaining his reasons for concluding, so soon after the 2019 revisions to the IAPP, that it was now necessary to disclose the identities of law

enforcement officers who were terminated, reduced in rank or grade or

suspended for misconduct for more than five days, the Attorney General wrote:

>After further review, I believe that even this significant set of changes does not go far enough. More is required to promote trust, transparency and accountability, and I have concluded that it is in the public's interest to reveal the identities of New Jersey law enforcement officers sanctioned for serious disciplinary violations. Our state's law enforcement agencies cannot carry out their important public safety responsibilities without the confidence of the people they serve. The public's trust depends on maintaining confidence that police officers serve their communities with dignity and respect. In the uncommon instance when officers fall well short of those expectations, the public has a right to know that an infraction occurred, and that the underlying issue was corrected before that officer potentially returned to duty.

>It is time to end the practice of protecting the few to the detriment of the many. The vast majority of law enforcement officers in New Jersey serve with honor and astonishing courage under extremely difficult circumstances. Most go through their entire careers without engaging in conduct that warrants a major disciplinary action against them. But their good work is easily undermined — and quickly forgotten — whenever an officer breaches the public's trust and dishonors the entire profession. The likelihood of such misbehavior increases when officers believe they can act with impunity; it decreases when officers know that their misconduct will be subject to public scrutiny and not protected. The deterrent effect of this scrutiny will, in the end, improve the culture of accountability among New Jersey law enforcement.

A-3950-19T4

Invoking the authority vested in him under the State Constitution, the

Criminal Justice Act of 1970, and section 181, the Attorney General in

Directive 2020-5 amended the IAPP to provide for the disclosure of the

identities of officers subject to termination, reduction in rank or grade, or

suspension of over five days:

> 9.11.1 On an annual basis, every law enforcement agency shall publish on its public website a report summarizing the types of complaints received and the dispositions of those complaints.  This report ~~can~~ **should** be statistical in nature~~, and the names of complainants and subject officers shall not be published~~.

> 9.11.2  On a periodic basis, and at least once a year, every agency shall submit to the County Prosecutor and publish on the agency's public website a brief synopsis of all complaints where a ~~fine or~~ **termination, reduction in rank or grade, and/or** suspension of ~~ten days or~~ more **than five days** was assessed to an agency member.  **This synopsis shall include the identity of each officer subject to final discipline, a brief summary of their transgressions, and a statement of the sanction imposed.**  This synopsis shall not contain the identities of the ~~officers or~~ complainants ~~but should briefly outline the nature of the transgression and the fine or suspension imposed~~.  An example of a synopsis is found in Appendix U.

A-3950-19T4

As earlier mentioned, the Directive requires each law enforcement agency to publish its first report in compliance with revised section 9.11.2 by December 31, 2020, covering all discipline imposed during the calendar year, and expressly states it shall not "be construed in any way to create any substantive right that may be enforced by any third party."  Directive 2020-5 also notes that nothing therein prevented local "agencies from releasing similar information regarding historical incidents of officer misconduct," and noted the law enforcement agencies within the Department of Law & Public Safety would shortly publish the names of officers receiving major discipline going back twenty years.  Specifically, the Directive informed that "State Police, which since 2000 has published an annual report summarizing incidents of major discipline that does not disclose the identities of the State Troopers, intends to update these annual reports with the Troopers' names no later than July 15, 2020."

In Directive 2020-6, "Requiring Public Disclosure of the Identities of Department's Officers Who Committed Serious Disciplinary Violations Since 2000," issued four days later on June 19, 2020, the Attorney General relied on the reasoning set forth in Directive 2020-5, explaining Directive 2020-6 complemented it "by ordering additional transparency measures for the

agencies that employ law enforcement officers within the Department of Law

and Public Safety."  The Attorney General explained that

> [s]haring the identities of individuals who received
> major discipline[1] will allow for public scrutiny and
> improve the culture of accountability among the
> Department's law enforcement agencies.  That is true
> even where an individual no longer works for the
> relevant agency, as many of our officers go on to serve
> with other law enforcement agencies, and the State at
> present lacks a licensing system to track such repeat
> disciplinary sanctions across agencies.  Moreover, the

---

[1]  "Under the Administrative Code, 'major discipline' and 'minor discipline' have defined meanings based on the quantum of punishment imposed.  The terms do not categorize the seriousness or type of underlying incident, as opposed to the punishment imposed."  Stallworth, 208 N.J. at 198.

"Major discipline" is defined as including removal, disciplinary demotion, and suspension or fine for more than five working days at any one time.  N.J.S.A. 34:13A-5.3; N.J.A.C. 4A:2-2.2(a).  By contrast, "minor discipline" is defined as a formal written reprimand or a suspension or fine of five working days or less.  N.J.S.A. 34:13A-5.3; N.J.A.C. 4A:2-3.1(a).

Under N.J.A.C. 4A:2-2.3, an employee may be subject to major discipline for:  (1) incompetency, inefficiency or failure to perform duties; (2) insubordination; (3) inability to perform duties; (4) chronic or excessive absenteeism or lateness; (5) conviction of a crime; (6) conduct unbecoming a public employee; (7) neglect of duty; (8) misuse of public property, including motor vehicles; (9) discrimination that affects equal employment opportunity (as defined in N.J.A.C. 4A:7-1.1), including sexual harassment; (10) violation of federal regulations concerning drug and alcohol use by and testing of employees who perform functions related to the operation of commercial motor vehicles, and State and local policies issued thereunder; (11) violation of New Jersey residency requirements as set forth in L. 2011, c. 70; and (12) other sufficient cause.

A-3950-19T4

sharing of identities will enable the public and policymakers to identify repeat offenders, and to hold the Department's law enforcement agencies accountable for their response to patterns of discipline. And, most importantly, the sharing of identities will help to build public confidence in the vast majority of officers in the New Jersey State Police, the Division of Criminal Justice, and the Juvenile Justice Commission, who — like the officers of other law enforcement agencies — serve with honor and astonishing courage under extremely difficult circumstances. Releasing the identities of those who committed major disciplinary infractions will show that all the remaining officers did not commit such an infraction — which will help to build significant trust between these law enforcement officers and the communities they serve.

Drawing on his authority under the Law and Public Safety Act of 1948, in addition to the powers vested in him in the State Constitution and the Criminal Justice Act of 1970, the Attorney General in Directive 2020-6 ordered the Division of State Police, the Division of Criminal Justice and the Juvenile Justice Commission to "each publish on its public website a brief synopsis of all complaints where a termination, reduction in rank or grade, and/or suspension of more than five days was assessed to a law enforcement officer since January 1, 2000." In accord with Directive 2020-5, the synopses are to "include the identity of each officer subject to a final disciplinary action, a summary of their transgressions, and a statement of the sanction imposed."

Directive 2020-6 further orders each division "[a]t least seven days prior to the publication of the synopses" to "provide notice to each officer it intends to identify, whenever possible." In those "cases where the officer is no longer employed by the division," it is to "make reasonable efforts to contact the officer at their last known residential address, email address, or phone number." As in Directive 2020-5, Directive 2020-6 states it is not to "be construed in any way to create any substantive right that may be enforced by any third party."

**The Attorney General's Authority to Issue Directives 2020-5 and 2020-6.**

Appellants necessarily acknowledge the Attorney General possesses explicit authority under the Criminal Justice Act of 1970 and section 181 to amend the IAPP, and under the authority of those statutes and the Law and Public Safety Act of 1948 to establish disciplinary policy generally for the law enforcement agencies within the Department of Law and Public Safety. Their primary argument on these appeals is that he lacks the authority to amend the IAPP and Departmental internal affairs policy so as to attach an officer's name to the summary descriptions of completed discipline that local law enforcement agencies were ordered to publish annually in the 2019 version of the IAPP and that State Police has been publishing since 2000. Appellants

contend adding officers' names conflicts with section 10 of OPRA; a regulation first adopted by the Department when OPRA was enacted, N.J.A.C. 13:1E13.2(a)(4); and various executive orders, most notably Executive Order 11 (Byrne), all of which protect the confidentiality of personnel records.

The simplest rejoinder to appellants' argument that the Directives violate section 10 of OPRA and the Department's government records regulation, suggested by amici National Coalition of Latino Officers and the Law Enforcement Action Partnership, is that this is not an OPRA case. OPRA is New Jersey's government records access statute, which provides a comprehensive framework to enable citizens to swiftly access government records, and includes a fee-shifting provision that requires an award of a reasonable attorney's fee to a prevailing requester. See Mason v. City of Hoboken, 196 N.J. 51, 57 (2008). Petitioners here are not citizens seeking records in pursuit of the "salutary goal . . . to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process." Asbury Park Press v. Ocean Cty. Prosecutor's Office, 374 N.J. Super. 312, 329 (Law Div. 2004). They are police unions seeking to block the Attorney General's efforts to make more transparent the secluded internal affairs process in the State's law enforcement

A-3950-19T4

agencies by publishing the names of officers receiving major discipline for misconduct.

Were this an OPRA case, with third parties seeking the information the Attorney General has determined to release in Directives 2020-5 and 2020-6, those third parties would not be entitled to the information under OPRA. As we recently held in Libertarians for Transparent Gov't v. Cumberland Cty., __ N.J. Super. __, __ (App. Div. 2020) (slip op. at 1, 13), a public employee's internal disciplinary records, including "a settlement agreement resolving an internal disciplinary action," are not "government records" under OPRA but instead are classified as "personnel record[s] exempt from disclosure under section 10 of the statute." The Attorney General has likewise taken pains to make clear that Directives 2020-5 and 2020-6 were issued "pursuant to the Attorney General's authority to ensure the uniform and efficient enforcement of the laws and administration of criminal justice throughout the State" and are not to be construed "to create any substantive right that may be enforced by any third party."

That OPRA requestors would be denied access to the disciplinary information the Attorney General has ordered published in the challenged Directives does not, however, answer the question of whether the Attorney

General has the authority to direct that information be published. The Attorney General argues the personnel information he has ordered published in Directives 2020-5 and 2020-6 is no different from other types of information deemed confidential in the Department's government records regulation, N.J.A.C. 13:1E-3.2(a), such as "materials that may reveal: case or matter specific legal strategy or advice, attorney work product, attorney-client privileged material, or other privileged material." N.J.A.C. 13:1E-3.2(a)(3). He contends "the regulation means only that an agency does not <u>have</u> to release [the records shielded by the regulation] — [the Department] could still <u>choose</u> to do so."

Specifically, the Attorney General reasons that because "it is well understood that the Department <u>can</u> disclose attorney work product and attorney-client privileged material if it believes disclosure is beneficial," the regulation likewise does not prevent his disclosure of "[r]ecords, specific to an individual employee or employees . . . and relating to or which form the basis of discipline, discharge, promotion, transfer, employee performance, employee evaluation, or other related activities, whether open, closed, or inactive." N.J.A.C. 13:1E-3.2(a)(4). We reject that argument for what it posits about protection of personnel records under OPRA.

31

There is no question but that "an exemption from a right of public access to a government record can be established . . . by administrative rule." Slaughter v. Gov't Records Council, 413 N.J. Super. 544, 550 (App. Div. 2010); see also N.J.S.A. 47:1A-9(a) (providing OPRA does not "abrogate any exemption of a public record or government record from public access heretofore made pursuant to [the Right to Know Law]; any other statute; resolution of either or both Houses of the Legislature; regulation promulgated under the authority of any statute or Executive Order of the Governor; Executive Order of the Governor; Rules of Court; any federal law; federal regulation; or federal order"). It is equally clear, of course, that the Department's government records regulation, N.J.A.C. 13:1E-3.2, cannot override legislative policy or give OPRA greater effect than permitted by the statute itself.[2] See In re Adoption of N.J.A.C. 7:26B, 128 N.J. 442, 450 (1992); see also O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371, 385 (App.

_____

[2] It is for this reason that we reject appellants' argument that the regulation provides an independent source for protecting the disciplinary information the Directives require be released. If OPRA does not prevent the Attorney General from publicly releasing the disciplinary information called for in the Directives, N.J.A.C. 13:1E-3.2 certainly will not do so. See Reilly v. AAA Mid-Atlantic Ins. Co. of N.J., 194 N.J. 474, 486 (2008) (explaining that an agency may not alter the terms of a statute or frustrate the legislative policy embodied therein by adoption of an implementing regulation).

Div. 2009) (noting "[a]bsent specific legislative leave, no agency is authorized to deviate from expressed or implied legislative policies").

The Attorney General's argument posits that OPRA is simply a "floor" below which the government cannot go in refusing access to public records. Although that may be true in many instances, and certainly appears correct when applied to the work product and attorney-client privileges the Attorney General proffers in his example, the analogy breaks down when applied to personnel records of government employees. As we explained in Libertarians for Transparent Gov't v. Cumberland Cty., ___ N.J. Super. at ___ (slip op. at 21), "personnel records of government employees have historically been treated differently from other sorts of public records." Well before OPRA, Governor Byrne in Executive Order 11 directed that "[e]xcept as otherwise provided by law . . . an instrumentality of government shall not disclose to anyone other than a person duly authorized by this State or the United States to inspect such information in connection with his official duties, personnel or pension records of an individual," with the now-familiar exception for an employee's name, title, position, salary, length of service, date of separation and the reason therefor, as well as the amount and type of pension the employee is receiving, all of which "shall be public." Id. at 22-24 (quoting

A-3950-19T4

Exec. Order No. 11 (Nov. 15, 1974) 1 Laws of New Jersey 1974 765, available at https://nj.gov/infobank/circular/eob11.shtml).

Michelson v. Wyatt, 379 N.J. Super. 611, 619-20 (App. Div. 2005), underscores that determining whether a document is subject to disclosure under OPRA is "a multi-layered process," in which "[c]are must be taken to determine the nature of the information sought by plaintiff and whether any regulations, executive orders or federal law operate to render the information confidential." Because OPRA expressly does not abrogate Executive Orders of the Governor, Executive Order 11 remains operative. N.J.S.A. 47:1A-9; Libertarians for Transparent Gov't v. Cumberland Cty., ___ N.J. Super. at ___ (slip op. at 27-28).

Thus, as to personnel and pension records, OPRA is not simply a "floor," permitting the Attorney General to release such records if he "choose[s] to do so." Instead, section 10 represents the State's public policy to protect the personnel records of public employees from disclosure. Id. at 16. The Attorney General, like any other "instrumentality of government," may not disclose an individual's personnel or pension records to anyone not authorized by the State or federal governments to inspect them in connection with their

official duties, "[e]xcept as otherwise provided by law."[3]  See Exec. Order No. 11 (Nov. 15, 1974); N.J.S.A. 47:1A-9; Libertarians for Transparent Gov't v. Cumberland Cty., ___ N.J. Super. at ___ (slip op. at 21).

Accordingly, we think the Attorney General on firmer footing when he argues he is authorized to release the disciplinary information called for in Directives 2020-5 and 2020-6 because the information is "required to be disclosed by another law."  Executive Order 11, section 10 and the Department's government records regulation all permit release of an

_____

[3]  We also reject any notion that the disciplinary information the Attorney General has ordered released pursuant to Directives 2020-5 and 2020-6 does not constitute a "personnel record" for the purpose of this analysis.  IAPP 9.12.1 provides that "[p]ersonnel records are separate and distinct from internal affairs investigation records, and internal affairs investigative reports shall never be placed in personnel records, nor shall personnel records be co-mingled with internal affairs files."  Section 9.12.2 makes plain that even in the event that "a complaint is sustained and discipline imposed, the only items to be placed into the employee's personnel file are a copy of the administrative charging form and a copy of the disposition form."  While the Attorney General has obvious good reason to distinguish between internal affairs records and personnel records and files in the IAPP, his characterization of the records is not controlling for purposes of OPRA.  See McGee v. Twp. of E. Amwell, 416 N.J. Super. 602, 616 (App. Div. 2010) (noting section 10's exemption for personnel records "is not limited to the items included in a personnel file"); see also Libertarians for Transparent Gov't v. Cumberland Cty., ___ N.J. Super. at ___ (slip op. at 1) (holding "a settlement agreement resolving an internal disciplinary action against a public employee is . . . a personnel record exempt from disclosure under section 10").  The disciplinary information the Attorney General has ordered made public in the Directives clearly comes under the heading of personnel records for purposes of OPRA.

individual's personnel or pension records "when required to be disclosed" or when "otherwise provided by" another law.  N.J.S.A. 47:1A-10; Exec. Order No. 11; N.J.A.C. 13:1E-3.2(a)(4) (prohibiting disclosure of records "other than those . . . enumerated in N.J.S.A. 47:1A-10 as available for public access").

The Legislature has designated the Attorney General as New Jersey's "chief law enforcement officer," responsible "for the general supervision of criminal justice" in the State, N.J.S.A. 52:17B-98, and charged him with "formulat[ing] and adopt[ing] rules and regulations for the efficient conduct of the work and general administration of the [D]epartment," N.J.S.A. 52:17B-4(d).  Attorney General Del Tufo exercised that responsibility "to issue the IAPP in 1991," Fraternal Order of Police, __ N.J. at __ (slip op. at 47), and his successors did so in issuing its subsequent amendments, which "[s]ection 181 effectively made . . . required policy for all municipal law enforcement agencies in New Jersey," id. at 34.  The Legislature's investiture of that authority in the Attorney General in those several statutes is "another law" that permits the Attorney General to make the internal affairs process more accessible to the public by ordering the publication of the names of New Jersey law enforcement officers sanctioned for serious disciplinary violations. For that reason, we are satisfied Directives 2020-5 and 2020-6 do not violate

Executive Order 11, section 10 or the Department's government records regulation.

Appellants argue the Attorney General cannot "abrogate" Executive Order 11 or section 10 of OPRA "through a Directive."  Although that argument appears formidable when first considered, it is less so on reflection, because it ignores why our courts have determined that Attorney General directives have "the force of law for police entities."  O'Shea, 410 N.J. Super. at 382.  Those directives have the force of law because the Legislature has expressly provided "the Attorney General[] statutory power to adopt guidelines, directives, and policies that bind law enforcement throughout our State."  Paff v. Ocean County Prosecutor's Office, 235 N.J. 1, 20-21 (2018); see also N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 565 (2017) (noting because Use of Force Reports are "required by law to be made" by the Attorney General's Use of Force Policy, they are not exempt from disclosure under OPRA's criminal investigatory records exemption).

Said another way, Attorney General directives have the force of law for police entities in New Jersey because the Legislature has deemed it to be so. Nowhere is that clearer than in the case of the IAPP, which the Legislature has expressly required every law enforcement agency in the State follow by

"adopt[ing] and implement[ing] guidelines" consistent with it. See N.J.S.A. 40A:14-181; O'Shea, 410 N.J. Super. at 383. In issuing Directives 2020-5 and 2020-6, the Attorney General did not usurp power; he exercised powers the Governor and the Legislature expressly accorded him. See Commc'ns Workers of Am., AFL-CIO v. Christie, 413 N.J. Super. 229, 257 (App. Div. 2010) (discussing cooperative allocation of power between executive and legislative branches of government). Because the Legislature has invested the Attorney General with authority to direct the entirety of the State's law enforcement apparatus through "guidelines, directives, and policies that bind law enforcement throughout our State," Paff, 235 N.J. at 20-21, we are satisfied Directives 2020-5 and 2020-6 were issued pursuant to "another law" for purposes of Executive Order 11 and section 10 of OPRA, and that the Attorney General has not "abrogated" either via directive.

There is another significant flaw in appellants' arguments against the Attorney General's authority to issue Directives 2020-5 and 2020-6 based on the confidentiality afforded all public employees in their personnel records by Executive Order 11 and section 10. Appellants fail to acknowledge that while OPRA does not differentiate between police officers and other public employees, section 181 does by granting the Attorney General exclusive

A-3950-19T4

authority over internal affairs policy for the State's law enforcement agencies, and thus over the processes governing officer discipline. See Williams v. Am. Auto Logistics, 226 N.J. 117, 126 (2016) (relying on "the oft-stated principle of statutory construction that a specific statutory declaration prevails over a more general one").

And, significantly, every iteration of the IAPP has either authorized or mandated the public disclosure of some information that would otherwise be barred by Executive Order 11 and section 10, most notably by permitting the public release of the details of any internal investigation or disciplinary action, and mandating that individual citizens be notified of the disposition of their complaints of police misconduct and provided an explanation for the outcome.[4] Moreover, since the 2000 version of the IAPP, issued prior to OPRA's passage, every iteration of the IAPP has expressly provided that the information and records of an internal investigation could be released at the direction of the Attorney General, an authority the Legislature has never acted to limit or

---

[4] Disclosure of internal affairs information is also routinely made for other purposes, including satisfying the State's obligations in criminal cases under Brady v. Maryland, 373 U.S. 83 (1963), or State v. Harris, 316 N.J. Super. 384 (App. Div. 1998), and satisfying discovery obligations in civil matters, see Bayer v. Twp. of Union, 414 N.J. Super. 238, 273 (App. Div. 2010).

curtail.[5] See J.H. v. R & M Tagliareni, LLC, 239 N.J. 198, 216 (2019) (noting an agency's construction of a statute over years without legislative interference generally evidences its conformity with the legislative intent).

Section 181's distinction of law enforcement officers reflects a decades-long recognition by both the Legislature and the courts that "police officers are different from other public employees." City of Jersey City v. Jersey City Police Officers Benevolent Ass'n, 154 N.J. 555, 572 (1998). It was fifty-five years ago that we said "[i]t must be recognized that a police officer is a special

---

[5] We do not consider N.J.S.A. 53:1-10.1, the statute requiring State Police to submit an annual report to the Legislature and the Governor of misconduct complaints by members of the public, without disclosing personal identifiers, as contrary, largely because of its limited scope. As already mentioned, the Senate Judiciary Committee statement to the bill that became N.J.S.A. 53:1-10.1 noted it "mirror[ed] the present reporting requirements applicable to local law enforcement agencies with regard to civilian complaints," Senate Judiciary Comm. Statement to S. 650 (Jan. 31, 2000), undoubtedly referring to the public reports mandated under the 1992 version of the IAPP, which was in effect in January 2000, when the bill was introduced. The statute is limited as it imposes a reporting obligation only on the Superintendent of State Police, not the Attorney General, and addresses only complaints of misconduct made by members of the public against members of the State Police. It in no way limits the Attorney General's broad authority over internal affairs. We note also from the reports in the appendix that the information provided in those annual reports substantially exceeds that required by statute, presumably at the direction of the Attorney General, particularly as it addresses all discipline imposed, not just those instances resulting from complaints by members of the public.

kind of public employee." Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965). Explaining why, we wrote that an officer's

> primary duty is to enforce and uphold the law. He carries a service revolver on his person and is constantly called upon to exercise tact, restraint and good judgment in his relationship with the public. He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public.
>
> [Ibid.]

Twenty-two years ago, the Court wrote it was because our courts and the Legislature had long recognized that "police officers are different from other public employees," that we likewise recognized "the scope of discretion accorded to the public entities that administer police departments is necessarily broad." City of Jersey City, 154 N.J. at 572. Police officers are held to higher standards of conduct than other public employees. In re Disciplinary Procedures of Phillips, 117 N.J. 567, 577 (1990). And we've held a police officer will not be heard to "complain that he is being held up as a model of proper conduct" because it is "one of the obligations [an officer] undertakes upon voluntary entry into the public service." Appeal of Emmons, 63 N.J. Super. 136, 141-42 (App. Div. 1960).

Because we entrust police officers "to carry firearms, drive emergency vehicles, and 'exercis[e] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them,'" officers can expect a higher degree of scrutiny of their performance, N.J.S.A. 40A:14-118, and have a lower expectation of privacy, Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 189 (1993) (quoting Policemen's Benevolent Ass'n of N.J., Local 318 v. Twp. of Washington, 850 F.2d 133, 141 (3d Cir. 1988)). Significantly, that includes a diminished expectation of privacy in their disciplinary records. Hart v. City of Jersey City, 308 N.J. Super. 487, 493 (App. Div. 1998) (finding no cause of action for invasion of privacy claims based upon publication of plaintiff's one-day suspension in an in-house police department bulletin, noting that "police officers, because they occupy positions of public trust and exercise special powers, have a diminished expectation of privacy"). And, of course, the Legislature itself acted last year to require the identities of law enforcement officers involved in the arrest or investigation of a death of a person in an encounter with a law enforcement officer acting in the officer's official capacity or while the decedent was in custody be made available to the public within twenty-four hours or as soon as practicable. N.J.S.A. 52:17B-107.1.

Given this long history of distinguishing law enforcement officers from other public employees by virtue of the public trust reposed in them to enforce and uphold the law, and the manifest "need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers" the authority to use lawful force to arrest and detain their fellow citizens, Policeman's Benevolent Ass'n of N.J., Local 318, 850 F.2d at 141, we cannot find the Attorney General's decision to exercise the authority he and his predecessors have long reserved in the IAPP to release confidential internal affairs records and information violates the rights of the State's law enforcement officers in the privacy of their personnel records under Executive Order 11, section 10 of OPRA, or N.J.A.C. 13:1E-3.2.

**"Retroactive Application" of the Directives.**

Appellants contend that because Directives 2020-5 and 2020-6 direct the release of internal affairs records of officers receiving major discipline before the Directives were issued, up to six months before in the case of 2020-5 and up to twenty years before in the case of 2020-6, the Directives constitute "ex post facto administrative provisions" that run afoul of the State's retroactivity cases. We reject the argument and the analysis.

First, "the prohibition against ex post facto laws applies only to laws of a penal and criminal nature," which the Directives assuredly are not. In re Kaplan, 178 N.J. Super. 487, 495 (App. Div. 1981). Second, a retroactivity analysis is undertaken only where there has been a change in the law. See In re D.C., 146 N.J. 31, 50 (1996). Although appellants' retroactivity arguments assume there's been a change in the law governing release of their disciplinary records, that is not accurate.

The Attorney General in Directives 2020-5 and 2020-6 has ordered the release of limited information gleaned from existing internal affairs records, consistent with his longstanding statutory authority under the Law and Public Safety Act of 1948, the Criminal Justice Act of 1970, and N.J.S.A. 40A:14-181, which we hold does not violate Executive Order 11, OPRA, and the Department's government records regulation. Accordingly, in issuing Directives 2020-5 and 2020-6, the Attorney General has only exercised authority he possesses under very old statutes. While it is certainly true the Attorney General has now exercised his authority to make certain information public that he had previously exercised his authority to keep confidential, his statutorily granted discretionary authority has not changed. And, as a decision to release any public record anticipates the disclosure of an existing record,

without regard to its historical nature, that is, when it was created, we are not convinced a retroactivity analysis is warranted or appropriate.

The purpose of permitting public access to existing public records "is the bedrock principle that our government works best when its activities are well-known to the public it serves." Burnett v. Cty. of Bergen, 198 N.J. 408, 414 (2009). That is the Attorney General's professed purpose in ordering disclosure of historical major disciplinary data; that permitting public scrutiny of New Jersey's internal affairs processes at all levels of law enforcement will instill greater accountability in those processes and promote greater trust and confidence in the State's law enforcement agencies. Because we find OPRA, Executive Order 11 and the Department's government records regulation permit the Attorney General's release of that information, the Directives do not violate the affected officers' rights to nondisclosure, regardless of when the discipline was imposed. A retroactivity analysis is not necessary.

Even were we to perform a retroactivity analysis, however, we would not strike down the Directives. A retroactive analysis would focus on two factors, whether retroactive application was intended and, if so, whether it would "result in either an unconstitutional interference with 'vested rights' or a 'manifest injustice.'" See In re D.C., 146 N.J. 31, 50 (1996). As there is no

doubt the Attorney General intended the Directives to reach prior discipline, the only question is whether doing so would work an unconstitutional interference with a vested right of affected officers or constitute a manifest injustice.  See State Troopers Fraternal Ass'n v. State, 149 N.J. 38, 54 (1997).

As already discussed at length, the IAPP for the last twenty years has advised all law enforcement officers that the Attorney General could direct the release of their internal affairs records.  That fact, coupled with the long-standing understanding that law enforcement officers are distinct among public employees, that there is a higher level of scrutiny of their performance, giving their employers a broader scope of discretion in administering their work and providing officers a lower expectation of privacy in their disciplinary records, convince us that they have no constitutionally protected vested right that the Directives could infringe.  See Lehrhaupt v. Flynn, 140 N.J. Super. 250, 261 (App. Div. 1976) (individual's right of privacy "may be limited by virtue of the legitimate right of the public to acquire knowledge of all facts relevant to the performance . . . of its public officials"), aff'd, 75 N.J. 459 (1978); see also Kenny v. Byrne, 144 N.J. Super. 243, 252-57 (App. Div. 1976) (holding executive order mandating financial disclosures of certain employees did not violate their right to privacy in light of "[p]aramount right of the people to

46

honest and impartial performance by their government employees"), aff'd o.b., 75 N.J. 458 (1978). That the Attorney General has not exercised his authority to release internal affairs records before does not make his doing so now a violation of a constitutionally protected vested right. Cf. Phillips v. Curiale, 128 N.J. 608, 620 (1992) (explaining "'[t]here can be no vested right in the continued existence of a statute or rule of the common law which precludes its change or repeal'" (quoting Savarese v. N.J. Auto. Full Ins. Underwriting Ass'n, 235 N.J. Super. 298, 309 (App. Div. 1989))).

Nor can we find that retroactive application of the Directives constitutes a violation of the manifest injustice doctrine. See State Troopers Fraternal Ass'n, 149 N.J. at 54 (explaining that "manifest-injustice analysis is a nonconstitutional, equitable doctrine designed to prevent unfair results that do not necessarily violate any constitutional provision"). The Court has explained that "manifest injustice analysis requires 'a weighing of the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance.'" Nobrega v. Edison Glen Assocs., 167 N.J. 520, 547 (2001) (quoting Nelson v. Bd. of Educ., 148 N.J. 358, 371 (1997)).

Appellants obviously cannot prevail on an argument that before officers decided to engage in the misconduct that would result in major discipline, they counted on their discipline remaining confidential. While we have no doubt that some officers in the last twenty years agreed to settle internal disciplinary actions, at least in part, to avoid their misconduct being made public, Libertarians for Transparent Gov't v. Cumberland Cty., __ N.J. Super. at __ (slip op. at 21), appellants cannot demonstrate that was universally true, and even if it were, we cannot find it outweighs the Attorney General's paramount interest in taking action to improve the public's trust in state and local police by making more transparent the processes that govern officer misconduct. Even were the public interest less weighty than it obviously is, the regular release of such records in criminal and civil actions and the Attorney General's clear statement for the last twenty years that any internal affairs record would be released at his direction are fatal to appellants' claim that the very limited release of final discipline the Attorney General has ordered in Directives 2020-5 and 2020-6 would constitute a manifest injustice to them.

Having said that, we are mindful of the sea change the Directives represent in the Department's policy regarding the confidentiality of officer disciplinary records and the deep feelings of unfairness the retroactive

 A-3950-19T4

application of these Directives have engendered among law enforcement officers, whether or not they will be personally affected by the disclosures to be made. As already noted, the Attorney General was only recently in our Supreme Court advocating for the necessity of not linking a trooper's name to the disciplinary summary we earlier referenced, released in the Division's 2015 report of trooper misconduct. Those are the same summaries he now intends to revise and release, identifying the trooper in each case of demotion, reduction in rank or grade or suspension longer than five days.

The Attorney General acknowledges his former position, arguing persuasively that the fraying of public trust in law enforcement in many of the State's communities has caused him to balance the costs of shielding the identities of officers found to have committed offenses warranting major discipline differently. He is allowed. As the Supreme Court has noted in the context of a regulatory agency's interpretation of a statute, time and experience matter. Glukowsky v. Equity One, Inc., 180 N.J. 49, 67 (2004). Agency law "is not static. It has elasticity that permits it to adapt to changing circumstances and conditions." Ibid. As the Attorney General argued in opposition to appellants' request to enjoin operation of the Directives pending

appeal, "sometimes the status quo is unacceptable and should not be preserved."

Leaving aside their disagreements over the Attorney General's policy choice, which are not for us to mediate, appellants and intervenors all contend officers were promised confidentiality when they settled internal disciplinary charges. Although the appendices in these appeals number many hundreds of pages, we noted only one general disciplinary negotiated resolution that stated it was a "mutually binding confidential resolution" of disciplinary charges. Much more common were certifications to the effect that officers settling disciplinary charges either "understood" such settlements would be confidential or were "assured" of such by either command personnel or deputy attorneys general acting on behalf of the Department.

While initially arguing the State's use of "confidential" in such agreements and assurances was only ever in the limited sense intended in OPRA and the IAPP, and thus that the State "never promised to keep such discipline secret for any reason and in perpetuity," the Attorney General conceded at oral argument that some officers might have contract claims to the confidentiality of internal settlement agreements entered into with the State. Although a representation or promise of confidentiality may not always shield

internal agreements resolving disciplinary charges from disclosure under the common law, see Libertarians for Transparent Gov't v. Cumberland Cty., __ N.J. Super. at __ (slip op. at 29-31), we are not prepared on this record to say they would not bind the Attorney General in an individual case in the absence of a common law request and ensuing court order directing publication. See W.V. Pangborne & Co. v. N.J. Dep't of Transp., 116 N.J. 543, 560-63 (1989) (discussing the obligation of the government to "turn square corners" in its dealings).

Appellants raise other claims, such as promissory and equitable estoppel, which likewise cannot be resolved on this record. Appellants have brought only a facial challenge to the Directives. Although we are confident that facial challenge must fail, the record is inadequate to address the claims individual officers might have against release of their names regarding discipline they received before the Attorney General issued the Directives.

To the extent affected officers wish to pursue as-applied challenges, we note the Attorney General in Directive 2020-6 has provided that officers whose names will be published receive notice at least seven days prior to publication. We assume he has done so to permit the officer to take what steps he or she deems necessary, whether that be to contact the Attorney General about the

accuracy of the information or specific privacy concerns — for instance, that

publication in the form proposed could reveal the victim of domestic violence[6]

— or to file an as-applied challenge to the Directives. Seven days provides

very little time for an officer, particularly one who may have long since

retired, to take action in response to the notice. We find a fourteen-day notice,

including the name and contact information for the person in the Attorney

---

[6] The Attorney General has dismissed appellants' concerns that attaching an officer's name to a previously released summary of misconduct will, in some instances, reveal the identity of a victim of domestic violence, insisting "the synopses will . . . not identify domestic violence victims by name or by relationship to the disciplined officer in accordance with the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, and Rule 1:38-3(b)(12)." The Attorney General writes in his brief, however, that "[w]hile the reports will of course mention whether an officer received major discipline for having engaged in domestic violence — an important sign of an officer's tendency to intolerable violence — that does not itself reveal the identity of a victim because the scope of possible domestic violence victims is much broader than appellants continue to suggest," citing N.J.S.A. 2C:25-19(d) (referring to "a spouse, former spouse, or any other person who is a present household member or was at any time a household member"). That a domestic violence victim could be someone other than the perpetrator's spouse, former spouse or significant other would not appear adequate protection for victims who do stand in such relation to an officer who received major discipline for having engaged in domestic violence. We expect the Attorney General will have to do more to protect the identities of domestic violence victims than simply rely on the definition of "victim of domestic violence" in the statute — whether that might include giving notice to those victims before publication to permit them to object, precluding identification of the officer in instances where the victim's privacy cannot reasonably be protected, or other steps to ensure victim anonymity is not before us.

A-3950-19T4

General's office who the officer may contact about the disclosure, would better allow the officer to take such steps. We likewise expect the Attorney General to require local departments making historical discipline information available to provide equivalent contact information and the same notice period.

To be clear, we are not suggesting that affected officers have viable as-applied challenges to Directives 2020-5 and 2020-6. If anything, our review of this record suggests many officers would likely have difficulty establishing an enforceable promise of confidentiality. Nevertheless, affected officers must be provided the opportunity to bring such claims, or to bring to the attention of the Attorney General or law enforcement executive other concerns about the information being released, which a fourteen-day notice adequately provides.

**Appellants' Remaining Arguments.**

None of appellants' remaining arguments requires extended discussion here. Although petitioners contend the Directives violate their rights to substantive and procedural due process and equal protection, their arguments are not weighty. Substantive due process doctrine does not protect an individual from all government action that might infringe her liberty in violation of a law. Instead, it "is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or

otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.'" Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 366 (1996) (quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989)).

As our Supreme Court has observed, "[w]ith the exception of certain intrusions on an individual's privacy and bodily integrity, the collective conscience of the United States Supreme Court is not easily shocked." Ibid. (citing Irvine v. California, 347 U.S. 128, 133 (1954) (finding no Fourteenth Amendment violation when state police officers broke into defendant's home and secretly placed a microphone in defendant's bedroom, as the trespass involved no coercion, violence or brutality to the defendant)). We are thus confident the Attorney General's release of a summary of the findings that led to a law enforcement officer's termination, demotion, or suspension for more than five days does not rise to the level of a substantive due process violation implicating petitioners' reputation or privacy rights. See ibid. (recalling that Justice Frankfurter in Rochin v. California, 342 U.S. 165, 172 (1951), equated substantive due process violations with abuses by government that "are . . . too close to the rack and the screw to permit of constitutional differentiation").

Appellants' claims that the Directives violate their substantive due process right to privacy under our State Constitution fare no better. Simply

stated, appellants cannot show they have a constitutionally protected reasonable expectation of privacy in their disciplinary records that is not outweighed by the government's interest in public disclosure, in light of prior case law establishing their diminished expectation of privacy in those records, and the clear statement in every IAPP issued since 2000 that the Attorney General could order the release of the records.  See Doe v. Poritz, 142 N.J. 1, 88-91 (1995) (upholding Megan's Law disclosure mandate against constitutional privacy challenge, finding that state interest in public disclosure substantially outweighed plaintiff's diminished privacy interest).

As to appellants' procedural due process argument, while we are mindful that our State Constitution extends due process protection to personal reputation, see Doe, 142 N.J. at 104, we have held "this does not mean that a liberty interest is implicated anytime a governmental agency transmits information that may impugn a person's reputation."  In re L.R., 321 N.J. Super. 444, 460 (App. Div. 1999).  We find no general right to a hearing here, especially as all affected officers have already received all the process they were due for their disciplinary charges, including representation by their

union.[7]  See <u>N.L.R.B. v. J. Weingarten, Inc.</u>, 420 U.S. 251 (1975).  As already discussed, we do not find any need for notice beyond that necessary to permit affected officers time to bring an as-applied challenge before the initial release of the names of officers who incurred discipline in or after 2000 but before issuance of the Directives.

We likewise find no merit in appellants' equal protection claims. Appellants' argument is that the Directives unconstitutionally differentiate between members of the State Police and law enforcement officers in the Division of Criminal Justice and the Juvenile Justice Commission on the one hand and the rest of the State's law enforcement officers on the other, and between all of those law enforcement officers and other public employees. Equal protection, of course, does not forbid all classification; it "requires only

---

[7] Petitioners certainly had no constitutional procedural due process right to be heard before the Attorney General adopted the policy announced in the Directives.  See <u>Minn. State Bd. for Cmty. Colls. v. Knight</u>, 465 U.S. 271, 283-86 (1984) (noting "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy"); <u>see also</u> <u>United States v. Fla. E. C. R. Co.</u>, 410 U.S. 224, 245-46 (1973) (recognizing distinction in administrative law between proceedings for promulgating policy-type rules applicable across the board from proceedings designed to adjudicate disputed facts in particular cases).  We also reject appellants' argument that the Directives were adopted in violation of their rights to notice and opportunity to be heard under the Administrative Procedures Act.  See <u>infra</u> p. 60.

that those classifications not be arbitrary." Doe, 142 N.J. at 91. "The constitutional requirement of equal protection is met by legislation which treats in a like or similar manner all persons within a class reasonably selected." Mason v. Civil Serv. Comm'n, 51 N.J. 115, 128 (1968).

Because appellants are not members of a suspect class and no fundamental constitutional right is impinged by publication of their disciplinary records, an equal protection claim will only succeed if "the relationship between the permissible goal and classification is so attenuated as to be arbitrary or irrational." In re Wheeler, 433 N.J. Super. 560, 619 (App. Div. 2013). As already discussed, the Legislature and our courts have long distinguished law enforcement officers from other public employees based on the responsibilities and privileges of law enforcement officers. See City of Jersey City, 154 N.J. at 572. Disclosing the names of law enforcement officers who have received major discipline is obviously rationally related to the Attorney General's goal of increasing transparency of internal affairs and officer discipline in the State's law enforcement agencies, thereby making them more accountable to the communities they serve.

As for the Directives distinguishing between those law enforcement officers within the Department of Law and Public Safety and those in local law

enforcement agencies, the Attorney General offers two reasons for doing so.

First, he asserts the officers within his Department must lead by example. He

reasons that by releasing the names of Department officers receiving major

discipline since 2000, he will inspire local agencies to do the same.

He also maintains that by leaving the decision to "release information

regarding historical incidents of officer misconduct" to local control, he has

ensured the law enforcement executive closest to the community will weigh

the costs and benefits of historical disclosure in light of local conditions.[8]

Although the State Police has for the past twenty years included summaries of

major discipline in its annual reports to the Legislature, it is only since 2011

that the IAPP has required local agencies to release a synopsis of all

---

[8] We have been provided with examples of two policy statements by county prosecutors in the wake of Directives 2020-5 and 2020-6. Both acknowledge the Directives will require a more consistent approach to the investigation of internal affairs matters and imposition of police discipline in their counties going forward. While also acknowledging the importance of retrospective disclosure to building greater trust with the diverse communities they serve, they take somewhat different approaches to the release of historic disciplinary sanctions as permitted by Directive 2020-5, acknowledging they lack the State Police's twenty year archive, as well as noting the variation in the quality of internal affairs functions across municipal departments, the reliability of available records and the disparities in discipline for similar offenses across departments and over time.

A-3950-19T4

complaints where a fine or suspension of ten days or more was assessed to a member of the agency. 2011 IAPP at 50.

The Attorney General's proffered reasons for distinguishing among law enforcement agencies constitute rational bases for the classifications appellants challenge. See Drew Assocs. of N.J., L.P. v. Travisano, 122 N.J. 249, 264 (1991); Barone v. Dep't of Human Servs., Div. of Med. Assistance & Health Servs., 107 N.J. 355, 367-77 (1987); N.J. Restaurants Ass'n v. Holderman, 24 N.J. 295, 300 (1957); Wheeler, 433 N.J. Super. at 619-20. The outcome would not be different were we to undertake an equal protection analysis under our State Constitution balancing test. See Doe, 142 N.J. at 94. Considering the affected officers' right in the confidentiality of their disciplinary records, the extent to which the Directives impinge that right, and balancing those interests against the public need for disclosure, we are satisfied the public need for more transparency in the internal affairs processes of the State's law enforcement agencies in this period of fraying public trust in law enforcement outweighs the officers' limited privacy right in their disciplinary records and the intrusion of that right to the extent of revealing incidents in which major discipline has been sustained. See Greenberg v. Kimmelman, 99 N.J. 552, 577 (1985) (explaining the balancing test).

Appellants' contention that the Attorney General promulgated Directives 2020-5 and 2020-6 in violation of the Administrative Procedures Act ignores our long-standing view that the Attorney General's law enforcement directives and guidelines "are not 'administrative rules' as defined in [N.J.S.A. 52:14B-2], and, thus, do not require formal promulgation under the [APA]." O'Shea, 410 N.J. Super. at 383. They fall within a statutory exception to the APA's definition of an administrative rule, because they constitute "statements concerning the internal management or discipline of an agency." N.J.S.A. 52:14B-2; O'Shea, 410 N.J. Super. at 383. Moreover, we have explicitly concluded that the Attorney General's issuance of the IAPP is not subject to administrative rulemaking under the APA. In re Carroll, 339 N.J. Super. 429, 442-43 (App. Div. 2011).

Several plaintiffs contend the Directives unconstitutionally impair their right to contract and violate their constitutional right to collective negotiations. None of the collective negotiations agreements in the record, however, addresses the confidentiality of personnel records, disciplinary records, or internal affairs records, other than to require compliance with the IAPP, which, of course, is issued pursuant to the Attorney General's authority under N.J.S.A. 40A:14-181, and is subject to amendment outside the collective negotiations

process, making a contract impairment analysis unnecessary. See Berg v. Christie, 225 N.J. 245, 259 (2016) (explaining contract impairment claims "entail an analysis that first examines whether a change in state law results in the substantial impairment of a contractual relationship"). To the extent those petitioners argue that confidentiality assurances are mandatorily negotiable, any scope of negotiations claim must be brought before the Public Employee Relations Commission.[9] See Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 614 (2020) (noting the Legislature has assigned to PERC in the first instance "the task of differentiating between negotiable subjects and non-negotiable policy considerations").

Finally, to the extent we have not already addressed them, we reject appellants' arguments that the Directives are arbitrary, capricious and unreasonable, and violate public policy. The Attorney General, as New Jersey's chief law enforcement officer, has broad supervisory authority over

---

[9] We are not aware of any pending scope of negotiations petition. Appellants in A-4002-19 have advised us of an unfair practice charge filed with PERC in June against the City of Paterson by Paterson Police PBA Local 1 and Paterson Police PBA Local 1 Superior Officers Association with interim restraints against publication of the names of current or former officers "who in the past twenty (20) years have been fired, demoted, or suspended for more than five days due to a disciplinary violation, whether with, or without a summary of the violation."

the enforcement and prosecution of the State's criminal laws at every level of government.  With that authority comes enormous responsibility for ensuring public confidence that the State's law enforcement officers are honest, unbiased and themselves law abiding and thus possessed of legitimate authority to "'exercis[e] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.'"  Rawlings, 133 N.J. at 189 (quoting Policemen's Benevolent Ass'n of N.J., Local 318, 850 F.2d at 141).

Like petitioners, the Attorney General is well aware that trust in the police is essential for them to safely and effectively perform their jobs of protecting the communities they have sworn to faithfully serve.  Concerned that community trust in our police has become seriously frayed in cities and towns across our State, he determined he could best improve that trust by instilling greater accountability in the internal affairs processes that govern officer misconduct by ending the long practice of shielding the identities of officers receiving major discipline.[10]

---

[10]  We note the information the Attorney General has ordered released in Directives 2020-5 and 2020-6 is quite limited, and far less than what some of our neighboring states have done in response to similar concerns.  See, e.g.,

A-3950-19T4

That step follows several other recent events that have likewise increased transparency and accountability of law enforcement agencies in this State, including making public use of force reports, see Lyndhurst, 229 N.J. at 577-78, the creation of civilian oversight boards, see Fraternal Order of Police, __ N.J. __ (slip op. at 3-4), and the passage of a statute requiring release of the identities of officers involved in the arrest or investigation of a death of a person in an encounter with a law enforcement officer acting in the officer's official capacity or while the decedent was in custody, N.J.S.A. 52:17B-107.1. The Attorney General's mandate to publish the names of those officers having been terminated, demoted or suspended for more than five days, appears to us neither arbitrary nor capricious and, instead, consistent with existing law and evolving public policy. See Lavezzi v. State, 219 N.J. 163, 171 (2014).

For the reasons expressed here, we reject petitioners' facial challenge to Attorney General Directives 2020-5 and 2020-6. We, nevertheless, continue our stay of the Directives for five days only, to permit appellants to file an immediate petition for certification and application for any further stay in the Supreme Court.

---

(continued)
2020 N.Y. Laws 96 (repealing N.Y. Civil Rights Law 50-a, and allowing for the public release of law enforcement disciplinary records).

A-3950-19T4

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION